# ILLINOIS *v.* GATES ET UX.

No. 81–430.   Argued October 13, 1982—Reargued March 1, 1983—
Decided June 8, 1983

214

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 246. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 274. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 291.

*Paul P. Biebel, Jr.*, First Assistant Attorney General of Illinois, reargued the cause for petitioner. With him on the briefs on reargument were *Tyrone C. Fahner*, former Attorney General, *Neil F. Hartigan*, Attorney General, *Michael A. Ficaro* and *Morton E. Friedman*, Assistant Attorneys General, *Daniel M. Harris*, and *James B. Zagel*. With him on the briefs on the original argument were Messrs. Fahner and Harris.

*Solicitor General Lee* argued the cause on reargument for the United States as *amicus curiae* urging reversal. With him on the brief on reargument were *Assistant Attorney General Jensen, Deputy Solicitor General Frey, Kathryn A. Oberly, Geoffrey S. Stewart,* and *Robert J. Erickson.* With him on the brief on the original argument were Mr. Jensen, *Alan I. Horowitz,* and *David B. Smith.*

*James W. Reilley* reargued the cause for respondents. With him on the brief on reargument were *Barry E. Witlin* and *Thomas Y. Davies.* With him on the brief on the original argument were Mr. Witlin, *Allan A. Ackerman,* and *Clyde W. Woody.**

---

*Briefs of *amici curiae* urging reversal were filed by *George Deukmejian,* Attorney General, *Robert H. Philibosian,* Chief Assistant Attorney General, *William D. Stein,* Assistant Attorney General, and *Clifford K. Thompson, Jr.,* Deputy Attorney General, for the State of California; by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Patrick F. Healy, William K. Lambie,* and *James A. Murphy* for Americans for Effective Law Enforcement, Inc., et al.; by *Robert L. Toms, Evelle J. Younger,*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents Lance and Susan Gates were indicted for violation of state drug laws after police officers, executing a search warrant, discovered marihuana and other contraband in their automobile and home. Prior to trial the Gateses moved to suppress evidence seized during this search. The Illinois Supreme Court affirmed the decisions of lower state courts granting the motion. 85 Ill. 2d 376, 423 N. E. 2d 887 (1981). It held that the affidavit submitted in support of the State's application for a warrant to search the Gateses' prop-

G. Joseph Bertain, Jr., and Lloyd F. Dunn for Laws at Work et al.; and by Newman A. Flanagan, Jack E. Yelverton, James P. Manak, Edwin L. Miller, Jr., Austin J. McGuigan, and John M. Massameno for the National District Attorneys Association, Inc.

Briefs of amici curiae urging affirmance were filed by Sidney Bernstein and Howard A. Specter for the Association of Trial Lawyers of America; by John C. Feirich, Melvin B. Lewis, Joshua Sachs, and Michael J. Costello for the Illinois State Bar Association; by Herman Kaufman and Edward M. Chikofsky for the New York Criminal Bar Association; and by James M. Doyle for the Legal Internship Program, Georgetown University Law Center.

Briefs of amici curiae were filed by Jim Smith, Attorney General, and Lawrence A. Kaden and Raymond L. Marky, Assistant Attorneys General, for the State of Florida et al.; by Gerald Baliles, Attorney General, and Jacqueline G. Epps, Senior Assistant Attorney General, for the Commonwealth of Virginia; by Morris Harrell, William W. Greenhalgh, William J. Mertens, and Steven H. Goldblatt for the American Bar Association; by Charles S. Sims and Burt Neuborne for the American Civil Liberties Union et al.; by Peter L. Zimroth and Barbara D. Underwood for the Committee on Criminal Law of the Association of the Bar of the City of New York; by Marshall W. Krause, Quin Denvir, Steffan B. Imhoff, and Paul Edward Bell for the National Association of Criminal Defense Lawyers et al.; by Kenneth M. Mogill for the National Legal Aid and Defender Association; by Frank G. Carrington, Jr., Griffin B. Bell, Wayne W. Schmidt, Alan Dye, Thomas Hendrickson, Courtney A. Evans, Rufus L. Edmisten, David S. Crump, Howard A. Kramer, Ronald A. Zumbrun, John H. Findley, Wayne T. Elliott, G. Stephen Parker, and Joseph E. Scuro for Seven Former Members of the Attorney General of the United States' Task Force on Violent Crime (1981) et al.; and by Dan Johnston, pro se, for the County Attorney of Polk County, Iowa.

erty was inadequate under this Court's decisions in *Aguilar* v. *Texas*, 378 U. S. 108 (1964), and *Spinelli* v. *United States*, 393 U. S. 410 (1969).

We granted certiorari to consider the application of the Fourth Amendment to a magistrate's issuance of a search warrant on the basis of a partially corroborated anonymous informant's tip. 454 U. S. 1140 (1982). After receiving briefs and hearing oral argument on this question, however, we requested the parties to address an additional question:

> "[W]hether the rule requiring the exclusion at a criminal trial of evidence obtained in violation of the Fourth Amendment, *Mapp* v. *Ohio*, 367 U. S. 643 (1961); *Weeks* v. *United States*, 232 U. S. 383 (1914), should to any extent be modified, so as, for example, not to require the exclusion of evidence obtained in the reasonable belief that the search and seizure at issue was consistent with the Fourth Amendment." 459 U. S. 1028 (1982).

We decide today, with apologies to all, that the issue we framed for the parties was not presented to the Illinois courts and, accordingly, do not address it. Rather, we consider the question originally presented in the petition for certiorari, and conclude that the Illinois Supreme Court read the requirements of our Fourth Amendment decisions too restrictively. Initially, however, we set forth our reasons for not addressing the question regarding modification of the exclusionary rule framed in our order of November 29, 1982. *Ibid.*

I

Our certiorari jurisdiction over decisions from state courts derives from 28 U. S. C. § 1257, which provides that "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows: . . . (3) By writ of certiorari, . . . where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes

of . . . the United States." The provision derives, albeit with important alterations, see, *e. g.*, Act of Dec. 23, 1914, ch. 2, 38 Stat. 790; Act of June 25, 1948, § 1257, 62 Stat. 929, from the Judiciary Act of 1789, § 25, 1 Stat. 85.

Although we have spoken frequently on the meaning of § 1257 and its predecessors, our decisions are in some respects not entirely clear. We held early on that § 25 of the Judiciary Act of 1789 furnished us with no jurisdiction unless a federal question had been both raised and decided in the state court below. As Justice Story wrote in *Crowell* v. *Randell*, 10 Pet. 368, 392 (1836): "If both of these requirements do not appear on the record, the appellate jurisdiction fails." See also *Owings* v. *Norwood's Lessee*, 5 Cranch 344 (1809).[1]

More recently, in *McGoldrick* v. *Compagnie Generale Transatlantique*, 309 U. S. 430, 434–435 (1940), the Court observed:

> "But it is also the settled practice of this Court, in the exercise of its appellate jurisdiction, that it is only in exceptional cases, and then only in cases coming from the federal courts, that it considers questions urged by a petitioner or appellant not pressed or passed upon in the courts below. . . . In cases coming here from state courts in which a state statute is assailed as unconstitutional, there are reasons of peculiar force which should lead us to refrain from deciding questions not presented or decided in the highest court of the state whose judicial action we are called upon to review. Apart from the

---

[1] The apparent rule of *Crowell* v. *Randell* that a federal claim have been *both* raised and addressed in state court was generally not understood in the literal fashion in which it was phrased. See R. Robertson & F. Kirkham, Jurisdiction of the Supreme Court of the United States § 60 (1951). Instead, the Court developed the rule that a claim would not be considered here unless it had been *either* raised or squarely considered and resolved in state court. See, *e. g., McGoldrick* v. *Compagnie Generale Transatlantique*, 309 U. S. 430, 434–435 (1940); *State Farm Mutual Ins. Co.* v. *Duel*, 324 U. S. 154, 160 (1945).

reluctance with which every court should proceed to set aside legislation as unconstitutional on grounds not properly presented, due regard for the appropriate relationship of this Court to state courts requires us to decline to consider and decide questions affecting the validity of state statutes not urged or considered there. It is for these reasons that this Court, where the constitutionality of a statute has been upheld in the state court, consistently refuses to consider any grounds of attack not raised or decided in that court."

Finally, the Court seemed to reaffirm the jurisdictional character of the rule against our deciding claims "not pressed nor passed upon" in state court in *State Farm Mutual Automobile Ins. Co.* v. *Duel*, 324 U. S. 154, 160 (1945), where we explained that "[s]ince the [State] Supreme Court did not pass on the question, we may not do so." See also *Hill* v. *California*, 401 U. S. 797, 805–806 (1971).

Notwithstanding these decisions, however, several of our more recent cases have treated the so-called "not pressed or passed upon below" rule as merely a prudential restriction. In *Terminiello* v. *Chicago*, 337 U. S. 1 (1949), the Court reversed a state criminal conviction on a ground not urged in state court, nor even in this Court. Likewise, in *Vachon* v. *New Hampshire*, 414 U. S. 478 (1974), the Court summarily reversed a state criminal conviction on the ground, not raised in state court, or here, that it had been obtained in violation of the Due Process Clause of the Fourteenth Amendment. The Court indicated in a footnote, *id.*, at 479, n. 3, that it possessed discretion to ignore the failure to raise in state court the question on which it decided the case.

In addition to this lack of clarity as to the character of the "not pressed or passed upon below" rule, we have recognized that it often may be unclear whether the particular federal question presented in this Court was raised or passed upon below. In *Dewey* v. *Des Moines*, 173 U. S. 193, 197–198 (1899), the fullest treatment of the subject, the Court said

that "[i]f the question were only an enlargement of the one mentioned in the assignment of errors, or if it were so connected with it in substance as to form but another ground or reason for alleging the invalidity of the [lower court's] judgment, we should have no hesitation in holding the assignment sufficient to permit the question to be now raised and argued. Parties are not confined here to the same arguments which were advanced in the courts below upon a Federal question there discussed."[2] We have not attempted, and likely would not have been able, to draw a clear-cut line between cases involving only an "enlargement" of questions presented below and those involving entirely new questions.

The application of these principles in the instant case is not entirely straightforward. It is clear in this case that respondents expressly raised, at every level of the Illinois judicial system, the claim that the Fourth Amendment had been violated by the actions of the Illinois police and that the evidence seized by the officers should be excluded from their trial. It also is clear that the State challenged, at every level of the Illinois court system, respondents' claim that the substantive requirements of the Fourth Amendment had been violated. The State never, however, raised or addressed the question whether the federal exclusionary rule should be modified in any respect, and none of the opinions of the

---

[2] In *Dewey*, certain assessments had been levied against the owner of property abutting a street paved by the city; a state trial court ordered that the property be forfeited when the assessments were not paid, and in addition, held the plaintiff in error personally liable for the amount by which the assessments exceeded the value of the lots. In state court the plaintiff in error argued that the imposition of personal liability against him violated the Due Process Clause of the Fourteenth Amendment, because he had not received personal notice of the assessment proceedings. In this Court, he also attempted to argue that the assessment itself constituted a taking under the Fourteenth Amendment. The Court held that, beyond arising from a single factual occurrence, the two claims "are not in anywise necessarily connected," 173 U. S., at 198. Because of this, we concluded that the plaintiff in error's taking claim could not be considered.

Illinois courts give any indication that the question was considered.

The case, of course, is before us on the State's petition for a writ of certiorari. Since the Act of Dec. 23, 1914, ch. 2, 38 Stat. 790, jurisdiction has been vested in this Court to review state-court decisions even when a claimed federal right has been upheld. Our prior decisions interpreting the "not pressed or passed on below" rule have not, however, involved a State's failure to raise a defense to a federal right or remedy asserted below. As explained below, however, we can see no reason to treat the State's failure to have challenged an asserted federal claim differently from the failure of the proponent of a federal claim to have raised that claim.

We have identified several purposes underlying the "not pressed or passed upon" rule: for the most part, these are as applicable to the State's failure to have opposed the assertion of a particular federal right, as to a party's failure to have asserted the claim. First, "[q]uestions not raised below are those on which the record is very likely to be inadequate since it certainly was not compiled with those questions in mind." *Cardinale* v. *Louisiana*, 394 U. S. 437, 439 (1969). Exactly the same difficulty exists when the State urges modification of an existing constitutional right or accompanying remedy. Here, for example, the record contains little, if anything, regarding the subjective good faith of the police officers that searched the Gateses' property—which might well be an important consideration in determining whether to fashion a good-faith exception to the exclusionary rule. Our consideration of whether to modify the exclusionary rule plainly would benefit from a record containing such facts.

Likewise, "due regard for the appropriate relationship of this Court to state courts," *McGoldrick* v. *Compagnie Generale Transatlantique*, 309 U. S., at 434–435, demands that those courts be given an opportunity to consider the constitutionality of the actions of state officials, and, equally important, proposed changes in existing remedies for uncon-

stitutional actions. Finally, by requiring that the State first argue to the state courts that the federal exclusionary rule should be modified, we permit a state court, even if it agrees with the State as a matter of federal law, to rest its decision on an adequate and independent state ground. See *Cardinale, supra,* at 439. Illinois, for example, adopted an exclusionary rule as early as 1923, see *People* v. *Brocamp,* 307 Ill. 448, 138 N. E. 728 (1923), and might adhere to its view even if it thought we would conclude that the federal rule should be modified. In short, the reasons supporting our refusal to hear federal claims not raised in state court apply with equal force to the State's failure to challenge the availability of a well-settled federal remedy. Whether the "not pressed or passed upon below" rule is jurisdictional, as our earlier decisions indicate, see *supra,* at 217–219, or prudential, as several of our later decisions assume, or whether its character might be different in cases like this from its character elsewhere, we need not decide. Whatever the character of the rule may be, consideration of the question presented in our order of November 29, 1982, would be contrary to the sound justifications for the "not pressed or passed upon below" rule, and we thus decide not to pass on the issue.

The fact that the Illinois courts affirmatively applied the federal exclusionary rule—suppressing evidence against respondents—does not affect our conclusion. In *Morrison* v. *Watson,* 154 U. S. 111 (1894), the Court was asked to consider whether a state statute impaired the plaintiff in error's contract with the defendant in error. It declined to hear the case because the question presented here had not been pressed or passed on below. The Court acknowledged that the lower court's opinion had restated the conclusion, set forth in an earlier decision of that court, that the state statute did not impermissibly impair contractual obligations. Nonetheless, it held that there was no showing that "there was any real contest at any stage of this case upon the point," *id.,* at 115, and that without such a contest, the routine restate-

ment and application of settled law by an appellate court did not satisfy the "not pressed or passed upon below" rule. Similarly, in the present case, although the Illinois courts applied the federal exclusionary rule, there was never "any real contest" upon the point. The application of the exclusionary rule was merely a routine act, once a violation of the Fourth Amendment had been found, and not the considered judgment of the Illinois courts on the question whether application of a modified rule would be warranted on the facts of this case. In such circumstances, absent the adversarial dispute necessary to apprise the state court of the arguments for not applying the exclusionary rule, we will not consider the question whether the exclusionary rule should be modified.

Likewise, we do not believe that the State's repeated opposition to respondents' substantive Fourth Amendment claims suffices to have raised the question whether the exclusionary rule should be modified. The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally" and not "a personal constitutional right of the party aggrieved." *United States* v. *Calandra*, 414 U. S. 338, 348 (1974). The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct. See, *e. g.*, *United States* v. *Havens*, 446 U. S. 620 (1980); *United States* v. *Ceccolini*, 435 U. S. 268 (1978); *United States* v. *Calandra, supra; Stone* v. *Powell*, 428 U. S. 465 (1976). Because of this distinction, we cannot say that modification or abolition of the exclusionary rule is "so connected with [the substantive Fourth Amendment right at issue] as to form but another ground or reason for alleging the invalidity" of the judgment. *Dewey* v. *Des Moines*, 173 U. S., at 197–198. Rather, the rule's modification was, for purposes of the "not pressed or passed upon below" rule, a separate claim that had to be specifically presented to the state courts.

Finally, weighty prudential considerations militate against our considering the question presented in our order of November 29, 1982. The extent of the continued vitality of the rules that have developed from our decisions in *Weeks* v. *United States*, 232 U. S. 383 (1914), and *Mapp* v. *Ohio*, 367 U. S. 643 (1961), is an issue of unusual significance. Sufficient evidence of this lies just in the comments on the issue that Members of this Court recently have made, *e. g.*, *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 415 (1971) (BURGER, C. J., dissenting); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 490 (1971) (Harlan, J., concurring); *id.*, at 502 (Black, J., dissenting); *Stone* v. *Powell, supra*, at 537–539 (WHITE, J., dissenting); *Brewer* v. *Williams*, 430 U. S. 387, 413–414 (1977) (POWELL, J., concurring); *Robbins* v. *California*, 453 U. S. 420, 437, 443–444 (1981) (REHNQUIST, J., dissenting). Where difficult issues of great public importance are involved, there are strong reasons to adhere scrupulously to the customary limitations on our discretion. By doing so we "promote respect . . . for the Court's adjudicatory process [and] the stability of [our] decisions." *Mapp* v. *Ohio*, 367 U. S., at 677 (Harlan, J., dissenting). Moreover, fidelity to the rule guarantees that a factual record will be available to us, thereby discouraging the framing of broad rules, seemingly sensible on one set of facts, which may prove ill-considered in other circumstances. In Justice Harlan's words, adherence to the rule lessens the threat of "untoward practical ramifications," *id.*, at 676 (dissenting opinion), not foreseen at the time of decision. The public importance of our decisions in *Weeks* and *Mapp* and the emotions engendered by the debate surrounding these decisions counsel that we meticulously observe our customary procedural rules. By following this course, we promote respect for the procedures by which our decisions are rendered, as well as confidence in the stability of prior decisions. A wise exercise of the powers confided in this Court dictates that we reserve for another day the question whether the exclusionary rule should be modified.

## II

We now turn to the question presented in the State's original petition for certiorari, which requires us to decide whether respondents' rights under the Fourth and Fourteenth Amendments were violated by the search of their car and house. A chronological statement of events usefully introduces the issues at stake. Bloomingdale, Ill., is a suburb of Chicago located in Du Page County. On May 3, 1978, the Bloomingdale Police Department received by mail an anonymous handwritten letter which read as follows:

> "This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,000.00 worth of drugs in their basement.
>
> "They brag about the fact they never have to work, and make their entire living on pushers.
>
> "I guarantee if you watch them carefully you will make a big catch. They are friends with some big drugs dealers, who visit their house often.
>
> > "Lance & Susan Gates
> > "Greenway
> > "in Condominiums"

The letter was referred by the Chief of Police of the Bloomingdale Police Department to Detective Mader, who decided to pursue the tip. Mader learned, from the office of the Illinois Secretary of State, that an Illinois driver's license had

been issued to one Lance Gates, residing at a stated address in Bloomingdale. He contacted a confidential informant, whose examination of certain financial records revealed a more recent address for the Gateses, and he also learned from a police officer assigned to O'Hare Airport that "L. Gates" had made a reservation on Eastern Airlines Flight 245 to West Palm Beach, Fla., scheduled to depart from Chicago on May 5 at 4:15 p. m.

Mader then made arrangements with an agent of the Drug Enforcement Administration for surveillance of the May 5 Eastern Airlines flight. The agent later reported to Mader that Gates had boarded the flight, and that federal agents in Florida had observed him arrive in West Palm Beach and take a taxi to the nearby Holiday Inn. They also reported that Gates went to a room registered to one Susan Gates and that, at 7 o'clock the next morning, Gates and an unidentified woman left the motel in a Mercury bearing Illinois license plates and drove northbound on an interstate highway frequently used by travelers to the Chicago area. In addition, the DEA agent informed Mader that the license plate number on the Mercury was registered to a Hornet station wagon owned by Gates. The agent also advised Mader that the driving time between West Palm Beach and Bloomingdale was approximately 22 to 24 hours.

Mader signed an affidavit setting forth the foregoing facts, and submitted it to a judge of the Circuit Court of Du Page County, together with a copy of the anonymous letter. The judge of that court thereupon issued a search warrant for the Gateses' residence and for their automobile. The judge, in deciding to issue the warrant, could have determined that the *modus operandi* of the Gateses had been substantially corroborated. As the anonymous letter predicted, Lance Gates had flown from Chicago to West Palm Beach late in the afternoon of May 5th, had checked into a hotel room registered in the name of his wife, and, at 7 o'clock the following morning, had headed north, accompanied by an unidentified woman,

out of West Palm Beach on an interstate highway used by travelers from South Florida to Chicago in an automobile bearing a license plate issued to him.

At 5:15 a. m. on March 7, only 36 hours after he had flown out of Chicago, Lance Gates, and his wife, returned to their home in Bloomingdale, driving the car in which they had left West Palm Beach some 22 hours earlier. The Bloomingdale police were awaiting them, searched the trunk of the Mercury, and uncovered approximately 350 pounds of marihuana. A search of the Gateses' home revealed marihuana, weapons, and other contraband. The Illinois Circuit Court ordered suppression of all these items, on the ground that the affidavit submitted to the Circuit Judge failed to support the necessary determination of probable cause to believe that the Gateses' automobile and home contained the contraband in question. This decision was affirmed in turn by the Illinois Appellate Court, 82 Ill. App. 3d 749, 403 N. E. 2d 77 (1980), and by a divided vote of the Supreme Court of Illinois. 85 Ill. 2d 376, 423 N. E. 2d 887 (1981).

The Illinois Supreme Court concluded—and we are inclined to agree—that, standing alone, the anonymous letter sent to the Bloomingdale Police Department would not provide the basis for a magistrate's determination that there was probable cause to believe contraband would be found in the Gateses' car and home. The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding the Gateses' criminal activities. Something more was required, then, before a magistrate could conclude that there was probable cause to believe that contraband would be found in the Gateses' home and car. See *Aguilar* v. *Texas*, 378 U. S., at 109, n. 1; *Nathanson* v. *United States*, 290 U. S. 41 (1933).

The Illinois Supreme Court also properly recognized that Detective Mader's affidavit might be capable of supplement-

ing the anonymous letter with information sufficient to permit a determination of probable cause. See *Whiteley* v. *Warden*, 401 U. S. 560, 567 (1971). In holding that the affidavit in fact did not contain sufficient additional information to sustain a determination of probable cause, the Illinois court applied a "two-pronged test," derived from our decision in *Spinelli* v. *United States*, 393 U. S. 410 (1969).[3] The Illinois Supreme Court, like some others, apparently understood *Spinelli* as requiring that the anonymous letter satisfy each of two independent requirements before it could be relied on. 85 Ill. 2d, at 383, 423 N. E. 2d, at 890. According to this view, the letter, as supplemented by Mader's affidavit, first had to adequately reveal the "basis of knowledge" of the letterwriter—the particular means by which he came by the information given in his report. Second, it had to pro-

---

[3] In *Spinelli*, police officers observed Mr. Spinelli going to and from a particular apartment, which the telephone company said contained two telephones with stated numbers. The officers also were "informed by a confidential reliable informant that William Spinelli [was engaging in illegal gambling activities]" at the apartment, and that he used two phones, with numbers corresponding to those possessed by the police. 393 U. S., at 414. The officers submitted an affidavit with this information to a magistrate and obtained a warrant to search Spinelli's apartment. We held that the magistrate could have made his determination of probable cause only by "abdicating his constitutional function," *id.*, at 416. The Government's affidavit contained absolutely no information regarding the informant's reliability. Thus, it did not satisfy *Aguilar*'s requirement that such affidavits contain "some of the underlying circumstances" indicating that "the informant . . . was 'credible'" or that "his information [was] 'reliable.'" *Aguilar* v. *Texas*, 378 U. S. 108, 114 (1964). In addition, the tip failed to satisfy *Aguilar*'s requirement that it detail "some of the underlying circumstances from which the informant concluded that . . . narcotics were where he claimed they were." *Ibid.* We also held that if the tip concerning Spinelli had contained "sufficient detail" to permit the magistrate to conclude "that he [was] relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation," 393 U. S., at 416, then he properly could have relied on it; we thought, however, that the tip lacked the requisite detail to permit this "self-verifying detail" analysis.

vide facts sufficiently establishing either the "veracity" of the affiant's informant, or, alternatively, the "reliability" of the informant's report in this particular case.

The Illinois court, alluding to an elaborate set of legal rules that have developed among various lower courts to enforce the "two-pronged test,"[4] found that the test had not been satisfied. First, the "veracity" prong was not satisfied because, "[t]here was simply no basis [for] conclud[ing] that the anonymous person [who wrote the letter to the Bloomingdale Police Department] was credible." *Id.*, at 385, 423 N. E. 2d, at 891. The court indicated that corroboration by police of details contained in the letter might never satisfy the "veracity" prong, and in any event, could not do so if, as in the present case, only "innocent" details are corroborated. *Id.*, at 390, 423 N. E. 2d, at 893. In addition, the letter gave no indication of the basis of its writer's knowledge of the

---

[4] See, *e. g.*, *Stanley* v. *State*, 19 Md. App. 507, 313 A. 2d 847 (1974). In summary, these rules posit that the "veracity" prong of the *Spinelli* test has two "spurs"—the informant's "credibility" and the "reliability" of his information. Various interpretations are advanced for the meaning of the "reliability" spur of the "veracity" prong. Both the "basis of knowledge" prong and the "veracity" prong are treated as entirely separate requirements, which must be independently satisfied in every case in order to sustain a determination of probable cause. See n. 5, *infra*. Some ancillary doctrines are relied on to satisfy certain of the foregoing requirements. For example, the "self-verifying detail" of a tip may satisfy the "basis of knowledge" requirement, although not the "credibility" spur of the "veracity" prong. See 85 Ill. 2d, at 388, 423 N. E. 2d, at 892. Conversely, corroboration would seem not capable of supporting the "basis of knowledge" prong, but only the "veracity" prong. *Id.*, at 390, 423 N. E. 2d, at 893.

The decision in *Stanley*, while expressly approving and conscientiously attempting to apply the "two-pronged test" observes that "[t]he built-in subtleties [of the test] are such, however, that a slipshod application calls down upon us the fury of Murphy's Law." 19 Md. App., at 528, 313 A. 2d, at 860 (footnote omitted). The decision also suggested that it is necessary to "evolve analogous guidelines [to hearsay rules employed in trial settings] for the reception of hearsay in a probable cause setting." *Id.*, at 522, n. 12, 313 A. 2d, at 857, n. 12.

Gateses' activities. The Illinois court understood *Spinelli* as permitting the detail contained in a tip to be used to infer that the informant had a reliable basis for his statements, but it thought that the anonymous letter failed to provide sufficient detail to permit such an inference. Thus, it concluded that no showing of probable cause had been made.

We agree with the Illinois Supreme Court that an informant's "veracity," "reliability," and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case,[5] which the opinion of the Supreme Court of Illinois would imply. Rather, as detailed below, they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

## III

This totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause[6] than

---

[5] The entirely independent character that the *Spinelli* prongs have assumed is indicated both by the opinion of the Illinois Supreme Court in this case, and by decisions of other courts. One frequently cited decision, *Stanley* v. *State, supra,* at 530, 313 A. 2d, at 861 (footnote omitted), remarks that "the dual requirements represented by the 'two-pronged test' are 'analytically severable' and an 'overkill' on one prong will not carry over to make up for a deficit on the other prong." See also n. 9, *infra.*

[6] Our original phrasing of the so-called "two-pronged test" in *Aguilar* v. *Texas, supra,* suggests that the two prongs were intended simply as guides to a magistrate's determination of probable cause, not as inflexible, independent requirements applicable in every case. In *Aguilar,* we required only that

"the magistrate must be informed of *some of the underlying circumstances* from which the informant concluded that . . . narcotics were where he claimed they were, and *some of the underlying circumstances* from which

is any rigid demand that specific "tests" be satisfied by every informant's tip.  Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a "practical, nontechnical conception." *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949).  "In dealing with probable cause, . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*, at 175.  Our observation in *United States* v. *Cortez*, 449 U. S. 411, 418 (1981), regarding "particularized suspicion," is also applicable to the probable-cause standard:

> "The process does not deal with hard certainties, but with probabilities.  Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and

the officer concluded that the informant . . . was 'credible' or his information 'reliable.'" *Id.*, at 114 (emphasis added).

As our language indicates, we intended neither a rigid compartmentalization of the inquiries into an informant's "veracity," "reliability," and "basis of knowledge," nor that these inquiries be elaborate exegeses of an informant's tip.  Rather, we required only that *some* facts bearing on two particular issues be provided to the magistrate.  Our decision in *Jaben* v. *United States*, 381 U. S. 214 (1965), demonstrated this latter point.  We held there that a criminal complaint showed probable cause to believe the defendant had attempted to evade the payment of income taxes.  We commented:

"Obviously any reliance upon factual allegations necessarily entails some degree of reliability upon the credibility of the source. . . . Nor does it indicate that each factual allegation which the affiant puts forth must be independently documented, or that each and every fact which contributed to his conclusions be spelled out in the complaint. . . . *It simply requires that enough information be presented to the Commissioner to enable him to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process.*" *Id.*, at 224–225 (emphasis added).

so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

As these comments illustrate, probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in *Adams* v. *Williams*, 407 U. S. 143, 147 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity. "One simple rule will not cover every situation." *Ibid.*[7]

---

[7] The diversity of informants' tips, as well as the usefulness of the total-ity-of-the-circumstances approach to probable cause, is reflected in our prior decisions on the subject. In *Jones* v. *United States*, 362 U. S. 257, 271 (1960), we held that probable cause to search petitioners' apartment was established by an affidavit based principally on an informant's tip. The unnamed informant claimed to have purchased narcotics from petition-ers at their apartment; the affiant stated that he had been given correct information from the informant on a prior occasion. This, and the fact that petitioners had admitted to police officers on another occasion that they were narcotics users, sufficed to support the magistrate's determination of probable cause.

Likewise, in *Rugendorf* v. *United States*, 376 U. S. 528 (1964), the Court upheld a magistrate's determination that there was probable cause to be-lieve that certain stolen property would be found in petitioner's apartment. The affidavit submitted to the magistrate stated that certain furs had been stolen, and that a confidential informant, who previously had furnished confidential information, said that he saw the furs in petitioner's home. Moreover, another confidential informant, also claimed to be reliable, stated that one Schweihs had stolen the furs. Police reports indicated that petitioner had been seen in Schweihs' company, and a third informant stated that petitioner was a fence for Schweihs.

Finally, in *Ker* v. *California*, 374 U. S. 23 (1963), we held that informa-tion within the knowledge of officers who searched the Kers' apartment provided them with probable cause to believe drugs would be found there. The officers were aware that one Murphy had previously sold marihuana

Moreover, the "two-pronged test" directs analysis into two largely independent channels—the informant's "veracity" or "reliability" and his "basis of knowledge." See nn. 4 and 5, *supra.* There are persuasive arguments against according these two elements such independent status. Instead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability. See, *e. g., Adams* v. *Williams, supra,* at 146–147; *United States* v. *Harris,* 403 U. S. 573 (1971).

If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. See *United States* v. *Sellers,* 483 F. 2d 37 (CA5 1973).[8] Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found

_____

to a police officer; the transaction had occurred in an isolated area, to which Murphy had led the police. The night after this transaction, police observed Mr. Ker and Murphy meet in the same location. Murphy approached Ker's car, and, although police could see nothing change hands, Murphy's *modus operandi* was identical to what it had been the night before. Moreover, when police followed Ker from the scene of the meeting with Murphy he managed to lose them after performing an abrupt U-turn. Finally, the police had a statement from an informant who had provided reliable information previously, that Ker was engaged in selling marihuana, and that his source was Murphy. We concluded that "[t]o say that this coincidence of information was sufficient to support a reasonable belief of the officers that Ker was illegally in possession of marijuana is to indulge in understatement." *Id.,* at 36.

[8] Compare *Stanley* v. *State,* 19 Md. App., at 530, 313 A. 2d, at 861, reasoning that "[e]ven assuming 'credibility' amounting to sainthood, the judge still may not accept the bare conclusion . . . of a sworn and known and trusted police-affiant."

rigorous scrutiny of the basis of his knowledge unnecessary. *Adams* v. *Williams, supra.* Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case. Unlike a totality-of-the-circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip, the "two-pronged test" has encouraged an excessively technical dissection of informants' tips,[9] with undue at-

---

[9] Some lower court decisions, brought to our attention by the State, reflect a rigid application of such rules. In *Bridger* v. *State*, 503 S. W. 2d 801 (Tex. Crim. App. 1974), the affiant had received a confession of armed robbery from one of two suspects in the robbery; in addition, the suspect had given the officer $800 in cash stolen during the robbery. The suspect also told the officer that the gun used in the robbery was hidden in the other suspect's apartment. A warrant issued on the basis of this was invalidated on the ground that the affidavit did not satisfactorily describe how the accomplice had obtained his information regarding the gun.

Likewise, in *People* v. *Palanza*, 55 Ill. App. 3d 1028, 371 N. E. 2d 687 (1978), the affidavit submitted in support of an application for a search warrant stated that an informant of proven and uncontested reliability had seen, in specifically described premises, "a quantity of a white crystalline substance which was represented to the informant by a white male occupant of the premises to be cocaine. Informant has observed cocaine on numerous occasions in the past and is thoroughly familiar with its appearance. The informant states that the white crystalline powder he observed in the above described premises appeared to him to be cocaine." *Id.*, at 1029, 371 N. E. 2d, at 688. The warrant issued on the basis of the affidavit was invalidated because "[t]here is no indication as to how the informant or for that matter any other person could tell whether a white substance was cocaine and not some other substance such as sugar or salt." *Id.*, at 1030, 371 N. E. 2d, at 689.

Finally, in *People* v. *Brethauer*, 174 Colo. 29, 482 P. 2d 369 (1971), an informant, stated to have supplied reliable information in the past, claimed that L. S. D. and marihuana were located on certain premises. The informant supplied police with drugs, which were tested by police and confirmed to be illegal substances. The affidavit setting forth these, and other, facts was found defective under both prongs of *Spinelli*.

tention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate.

As early as *Locke* v. *United States*, 7 Cranch 339, 348 (1813), Chief Justice Marshall observed, in a closely related context: "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . . It imports a seizure made under circumstances which warrant suspicion." More recently, we said that "the *quanta* . . . of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. *Brinegar*, 338 U. S., at 173. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli*, 393 U. S., at 419. See Model Code of Pre-Arraignment Procedure § 210.1(7) (Prop. Off. Draft 1972); 1 W. LaFave, Search and Seizure § 3.2(e) (1978).

We also have recognized that affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States* v. *Ventresca*, 380 U. S. 102, 108 (1965). Likewise, search and arrest warrants long have been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of "probable cause." See *Shadwick* v. *City of Tampa*, 407 U. S. 345, 348–350 (1972). The rigorous inquiry into the *Spinelli* prongs and the complex superstructure of evidentiary and analytical rules that some have seen implicit in our *Spinelli* decision, cannot be reconciled with the fact that many warrants are—quite properly, 407 U. S., at 348–350—issued on the basis of nontechnical,

common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings. Likewise, given the informal, often hurried context in which it must be applied, the "built-in subtleties," *Stanley* v. *State*, 19 Md. App. 507, 528, 313 A. 2d 847, 860 (1974), of the "two-pronged test" are particularly unlikely to assist magistrates in determining probable cause.

Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli, supra,* at 419. "A grudging or negative attitude by reviewing courts toward warrants," *Ventresca,* 380 U. S., at 108, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.,* at 109.

If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search. In addition, the possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring "the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States* v. *Chadwick,* 433 U. S. 1, 9 (1977). Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a "substantial basis for . . . conclud[ing]" that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. *Jones* v. *United States,* 362 U. S. 257, 271 (1960). See *United States* v.

*Harris*, 403 U. S., at 577–583.[10]   We think reaffirmation of this standard better serves the purpose of encouraging recourse to the warrant procedure and is more consistent with our traditional deference to the probable-cause determinations of magistrates than is the "two-pronged test."

Finally, the direction taken by decisions following *Spinelli* poorly serves "[t]he most basic function of any government": "to provide for the security of the individual and of his property." *Miranda* v. *Arizona*, 384 U. S. 436, 539 (1966) (WHITE, J., dissenting).   The strictures that inevitably accompany the "two-pronged test" cannot avoid seriously impeding the task of law enforcement, see, *e. g.*, n. 9, *supra.* If, as the Illinois Supreme Court apparently thought, that test must be rigorously applied in every case, anonymous tips would be of greatly diminished value in police work.   Ordinary citizens, like ordinary witnesses, see Advisory Committee's Notes on Fed. Rule Evid. 701, 28 U. S. C. App., p. 570, generally do not provide extensive recitations of the basis of their everyday observations.   Likewise, as the Illinois Supreme Court observed in this case, the veracity of persons supplying anonymous tips is by hypothesis largely unknown, and unknowable.   As a result, anonymous tips seldom could survive a rigorous application of either of the *Spinelli* prongs.   Yet, such tips, particularly when supplemented by

[10] We also have said that "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," *United States* v. *Ventresca*, 380 U. S. 102, 109 (1965).   This reflects both a desire to encourage use of the warrant process by police officers and a recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.   Even if we were to accept the premise that the accurate assessment of probable cause would be furthered by the "two-pronged test," which we do not, these Fourth Amendment policies would require a less rigorous standard than that which appears to have been read into *Aguilar* and *Spinelli*.

independent police investigation, frequently contribute to the solution of otherwise "perfect crimes." While a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not.

For all these reasons, we conclude that it is wiser to abandon the "two-pronged test" established by our decisions in *Aguilar* and *Spinelli*.[11] In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. See *Jones* v. *United States*, *supra; United States* v. *Ventresca*, 380 U. S. 102 (1965); *Brinegar* v. *United States*, 338 U. S. 160 (1949). The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause

---

[11] The Court's decision in *Spinelli* has been the subject of considerable criticism, both by Members of this Court and others. JUSTICE BLACK-MUN, concurring in *United States* v. *Harris*, 403 U. S. 573, 585–586 (1971), noted his long-held view "that *Spinelli* . . . was wrongly decided" by this Court. Justice Black similarly would have overruled that decision. *Id.*, at 585. Likewise, a noted commentator has observed that "[t]he *Aguilar-Spinelli* formulation has provoked apparently ceaseless litigation." 8A J. Moore, Moore's Federal Practice ¶ 41.04, p. 41–43 (1982).

Whether the allegations submitted to the magistrate in *Spinelli* would, under the view we now take, have supported a finding of probable cause, we think it would not be profitable to decide. There are so many variables in the probable-cause equation that one determination will seldom be a useful "precedent" for another. Suffice it to say that while we in no way abandon *Spinelli*'s concern for the trustworthiness of informers and for the principle that it is the magistrate who must ultimately make a finding of probable cause, we reject the rigid categorization suggested by some of its language.

existed. *Jones* v. *United States,* 362 U. S., at 271. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from *Aguilar* and *Spinelli.*

Our earlier cases illustrate the limits beyond which a magistrate may not venture in issuing a warrant. A sworn statement of an affiant that "he has cause to suspect and does believe" that liquor illegally brought into the United States is located on certain premises will not do. *Nathanson* v. *United States,* 290 U. S. 41 (1933). An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and the wholly conclusory statement at issue in *Nathanson* failed to meet this requirement. An officer's statement that "[a]ffiants have received reliable information from a credible person and do believe" that heroin is stored in a home, is likewise inadequate. *Aguilar* v. *Texas,* 378 U. S. 108 (1964). As in *Nathanson,* this is a mere conclusory statement that gives the magistrate virtually no basis at all for making a judgment regarding probable cause. Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued. But when we move beyond the "bare bones" affidavits present in cases such as *Nathanson* and *Aguilar,* this area simply does not lend itself to a prescribed set of rules, like that which had developed from *Spinelli.* Instead, the flexible, common-sense standard articulated in *Jones, Ventresca,* and *Brinegar* better serves the purposes of the Fourth Amendment's probable-cause requirement.

JUSTICE BRENNAN's dissent suggests in several places that the approach we take today somehow downgrades the

role of the neutral magistrate, because *Aguilar* and *Spinelli* "preserve the role of magistrates as independent arbiters of probable cause . . . ." *Post*, at 287. Quite the contrary, we believe, is the case. The essential protection of the warrant requirement of the Fourth Amendment, as stated in *Johnson* v. *United States*, 333 U. S. 10 (1948), is in "requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.*, at 13–14. Nothing in our opinion in any way lessens the authority of the magistrate to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant; indeed, he is freer than under the regime of *Aguilar* and *Spinelli* to draw such inferences, or to refuse to draw them if he is so minded.

The real gist of JUSTICE BRENNAN's criticism seems to be a second argument, somewhat at odds with the first, that magistrates should be restricted in their authority to make probable-cause determinations by the standards laid down in *Aguilar* and *Spinelli*, and that such findings "should not be authorized unless there is some assurance that the information on which they are based has been obtained in a reliable way by an honest or credible person." *Post*, at 283. However, under our opinion magistrates remain perfectly free to exact such assurances as they deem necessary, as well as those required by this opinion, in making probable-cause determinations. JUSTICE BRENNAN would apparently prefer that magistrates be restricted in their findings of probable cause by the development of an elaborate body of case law dealing with the "veracity" prong of the *Spinelli* test, which in turn is broken down into two "spurs"—the informant's "credibility" and the "reliability" of his information, together with the "basis of knowledge" prong of the *Spinelli* test. See n. 4, *supra*. That such a labyrinthine body of judicial refinement bears any relationship to familiar definitions of

probable cause is hard to imagine. As previously noted, probable cause deals "with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," *Brinegar* v. *United States*, 338 U. S., at 175.

JUSTICE BRENNAN's dissent also suggests that "[w]ords such as 'practical,' 'nontechnical,' and 'common sense,' as used in the Court's opinion, are but code words for an overly permissive attitude towards police practices in derogation of the rights secured by the Fourth Amendment." *Post*, at 290. An easy, but not a complete, answer to this rather florid statement would be that nothing we know about Justice Rutledge suggests that he would have used the words he chose in *Brinegar* in such a manner. More fundamentally, no one doubts that "under our Constitution only measures consistent with the Fourth Amendment may be employed by government to cure [the horrors of drug trafficking]," *post*, at 290; but this agreement does not advance the inquiry as to which measures are, and which measures are not, consistent with the Fourth Amendment. "Fidelity" to the commands of the Constitution suggests balanced judgment rather than exhortation. The highest "fidelity" is not achieved by the judge who instinctively goes furthest in upholding even the most bizarre claim of individual constitutional rights, any more than it is achieved by a judge who instinctively goes furthest in accepting the most restrictive claims of governmental authorities. The task of this Court, as of other courts, is to "hold the balance true," and we think we have done that in this case.

## IV

Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work. In *Jones* v. *United States*, 362 U. S., at 269, we held that an affidavit relying on hearsay "is not to

be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented." We went on to say that even in making a warrantless arrest an officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Ibid.* Likewise, we recognized the probative value of corroborative efforts of police officials in *Aguilar*—the source of the "two-pronged test"—by observing that if the police had made some effort to corroborate the informant's report at issue, "an entirely different case" would have been presented. *Aguilar*, 378 U. S., at 109, n. 1.

Our decision in *Draper* v. *United States*, 358 U. S. 307 (1959), however, is the classic case on the value of corroborative efforts of police officials. There, an informant named Hereford reported that Draper would arrive in Denver on a train from Chicago on one of two days, and that he would be carrying a quantity of heroin. The informant also supplied a fairly detailed physical description of Draper, and predicted that he would be wearing a light colored raincoat, brown slacks, and black shoes, and would be walking "real fast." *Id.*, at 309. Hereford gave no indication of the basis for his information.[12]

On one of the stated dates police officers observed a man matching this description exit a train arriving from Chicago; his attire and luggage matched Hereford's report and he was

---

[12] The tip in *Draper* might well not have survived the rigid application of the "two-pronged test" that developed following *Spinelli*. The only reference to Hereford's reliability was that he had "been engaged as a 'special employee' of the Bureau of Narcotics at Denver for about six months, and from time to time gave information to [the police for] small sums of money, and that [the officer] had always found the information given by Hereford to be accurate and reliable." 358 U. S., at 309. Likewise, the tip gave no indication of how Hereford came by his information. At most, the detailed and accurate predictions in the tip indicated that, however Hereford obtained his information, it was reliable.

walking rapidly. We explained in *Draper* that, by this point in his investigation, the arresting officer "had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, [the officer] had 'reasonable grounds' to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true," *id.*, at 313.

The showing of probable cause in the present case was fully as compelling as that in *Draper*. Even standing alone, the facts obtained through the independent investigation of Mader and the DEA at least suggested that the Gateses were involved in drug trafficking. In addition to being a popular vacation site, Florida is well known as a source of narcotics and other illegal drugs. See *United States* v. *Mendenhall*, 446 U. S. 544, 562 (1980) (POWELL, J., concurring in part and concurring in judgment); DEA, Narcotics Intelligence Estimate, The Supply of Drugs to the U. S. Illicit Market From Foreign and Domestic Sources in 1980, pp. 8–9. Lance Gates' flight to West Palm Beach, his brief, overnight stay in a motel, and apparent immediate return north to Chicago in the family car, conveniently awaiting him in West Palm Beach, is as suggestive of a prearranged drug run, as it is of an ordinary vacation trip.

In addition, the judge could rely on the anonymous letter, which had been corroborated in major part by Mader's efforts—just as had occurred in *Draper*.[13] The Supreme Court

---

[13] The Illinois Supreme Court thought that the verification of details contained in the anonymous letter in this case amounted only to "[t]he corroboration of innocent activity," 85 Ill. 2d 376, 390, 423 N. E. 2d 887, 893 (1981), and that this was insufficient to support a finding of probable cause. We are inclined to agree, however, with the observation of Justice Moran in his dissenting opinion that "[i]n this case, just as in *Draper*, seemingly innocent activity became suspicious in light of the initial tip." *Id.*, at 396,

of Illinois reasoned that *Draper* involved an informant who had given reliable information on previous occasions, while the honesty and reliability of the anonymous informant in this case were unknown to the Bloomingdale police. While this distinction might be an apt one at the time the Police Department received the anonymous letter, it became far less significant after Mader's independent investigative work occurred. The corroboration of the letter's predictions that the Gateses' car would be in Florida, that Lance Gates would fly to Florida in the next day or so, and that he would drive the car north toward Bloomingdale all indicated, albeit not with certainty, that the informant's other assertions also were true. "[B]ecause an informant is right about some things, he is more probably right about other facts," *Spinelli*, 393 U. S., at 427 (WHITE, J., concurring)—including the claim regarding the Gateses' illegal activity. This may well not be the type of "reliability" or "veracity" necessary to satisfy some views of the "veracity prong" of *Spinelli*, but we think it suffices for the practical, common-sense judgment called for in making a probable-cause determination. It is enough, for purposes of assessing probable cause, that "[c]orroboration through other sources of information reduced the

423 N. E. 2d, at 896. And it bears noting that *all* of the corroborating detail established in *Draper* was of entirely innocent activity—a fact later pointed out by the Court in both *Jones* v. *United States*, 362 U. S., at 269–270, and *Ker* v. *California*, 374 U. S., at 36.

This is perfectly reasonable. As discussed previously, probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens' demands. We think the Illinois court attempted a too rigid classification of the types of conduct that may be relied upon in seeking to demonstrate probable cause. See *Brown* v. *Texas*, 443 U. S. 47, 52, n. 2 (1979). In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.

chances of a reckless or prevaricating tale," thus providing "a substantial basis for crediting the hearsay." *Jones* v. *United States*, 362 U. S., at 269, 271.

Finally, the anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. The letterwriter's accurate information as to the travel plans of each of the Gateses was of a character likely obtained only from the Gateses themselves, or from someone familiar with their not entirely ordinary travel plans. If the informant had access to accurate information of this type a magistrate could properly conclude that it was not unlikely that he also had access to reliable information of the Gateses' alleged illegal activities.[14] Of

---

[14] JUSTICE STEVENS' dissent seizes on one inaccuracy in the anonymous informant's letter—its statement that Sue Gates would fly from Florida to Illinois, when in fact she drove—and argues that the probative value of the entire tip was undermined by this allegedly "material mistake." We have never required that informants used by the police be infallible, and can see no reason to impose such a requirement in this case. Probable cause, particularly when police have obtained a warrant, simply does not require the perfection the dissent finds necessary.

Likewise, there is no force to the dissent's argument that the Gateses' action in leaving their home unguarded undercut the informant's claim that drugs were hidden there. Indeed, the line-by-line scrutiny that the dissent applies to the anonymous letter is akin to that which we find inappropriate in reviewing magistrates' decisions. The dissent apparently attributes to the judge who issued the warrant in this case the rather implausible notion that persons dealing in drugs always stay at home, apparently out of fear that to leave might risk intrusion by criminals. If accurate, one could not help sympathizing with the self-imposed isolation of people so situated. In reality, however, it is scarcely likely that the judge ever thought that the anonymous tip "kept one spouse" at home, much less that he relied on the theory advanced by the dissent. The letter simply says that Sue would fly from Florida to Illinois, without indicating whether the Gateses made the bitter choice of leaving the drugs in their house, or those in their car, unguarded. The judge's determination that there might be drugs or evidence of criminal activity in the Gateses' home was well supported by the less speculative theory, noted in text, that if the informant

course, the Gateses' travel plans might have been learned from a talkative neighbor or travel agent; under the "two-pronged test" developed from *Spinelli*, the character of the details in the anonymous letter might well not permit a sufficiently clear inference regarding the letterwriter's "basis of knowledge." But, as discussed previously, *supra*, at 235, probable cause does not demand the certainty we associate with formal trials. It is enough that there was a fair probability that the writer of the anonymous letter had obtained his entire story either from the Gateses or someone they trusted. And corroboration of major portions of the letter's predictions provides just this probability. It is apparent, therefore, that the judge issuing the warrant had a "substantial basis for . . . conclud[ing]" that probable cause to search the Gateses' home and car existed. The judgment of the Supreme Court of Illinois therefore must be

*Reversed.*

JUSTICE WHITE, concurring in the judgment.

In my view, the question regarding modification of the exclusionary rule framed in our order of November 29, 1982, 459 U. S. 1028 (1982), is properly before us and should be addressed. I continue to believe that the exclusionary rule is an inappropriate remedy where law enforcement officials act in the reasonable belief that a search and seizure was consistent with the Fourth Amendment—a position I set forth in *Stone* v. *Powell*, 428 U. S. 465, 537–539 (1976). In this case, it was fully reasonable for the Bloomingdale, Ill., police to believe that their search of respondents' house and automobile comported with the Fourth Amendment as the search was conducted pursuant to a judicially issued warrant. The

---

could predict with considerable accuracy the somewhat unusual travel plans of the Gateses, he probably also had a reliable basis for his statements that the Gateses kept a large quantity of drugs in their home and frequently were visited by other drug traffickers there.

exclusion of probative evidence where the constable has *not* blundered not only sets the criminal free but also fails to serve any constitutional interest in securing compliance with the important requirements of the Fourth Amendment. On this basis, I concur in the Court's judgment that the decision of the Illinois Supreme Court must be reversed.

## I

The Court declines to address the exclusionary rule question because the Illinois courts were not invited to modify the rule in the first instance. The Court's refusal to face this important question cannot be ascribed to jurisdictional limitations. I fully agree that the statute which gives us jurisdiction in this cause, 28 U. S. C. § 1257(3), prevents us from deciding federal constitutional claims raised here for the first time on review of state-court decisions. *Cardinale* v. *Louisiana*, 394 U. S. 437, 438–439 (1969). But it is equally well established that " '[n]o particular form of words or phrases is essential, but only that the claim of invalidity and the ground therefor be brought to the attention of the state court with fair precision and in due time.' " *Street* v. *New York*, 394 U. S. 576, 584 (1969) (quoting *New York ex rel. Bryant* v. *Zimmerman*, 278 U. S. 63, 67 (1928)). Notwithstanding the select and controversial instances in which the Court has reversed a state-court decision for "plain error,"[1] we have consistently dismissed for want of jurisdiction where the federal claim asserted in this Court was not raised below. But this obviously is not such a case. As the Court points out, "[i]t is clear in this case that respondents expressly raised, at every level of the Illinois judicial system, the claim that the Fourth Amendment had been violated by the actions of the Illinois

---

[1] See, *e. g.*, *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Wood* v. *Georgia*, 450 U. S. 261 (1981); *Vachon* v. *New Hampshire*, 414 U. S. 478 (1974) *(per curiam)*. Of course, to the extent these cases were correctly decided, they indicate *a fortiori* that the exclusionary rule issue in this case is properly before us.

police and that the evidence seized by the officers should be excluded from their trial." *Ante*, at 220. Until today, we have not required more.

We have never suggested that the jurisdictional stipulations of § 1257 require that all arguments on behalf of, let alone in opposition to, a federal claim be raised and decided below.[2] See R. Stern & E. Gressman, Supreme Court Practice 230 (5th ed. 1978). *Dewey* v. *Des Moines*, 173 U. S. 193 (1899), distinguished the raising of constitutional claims and the making of arguments in support of or in opposition to those claims.

> "If the question were only an enlargement of the one mentioned in the assignment of errors, or if it were so connected with it in substance as to form but another ground or reason for alleging the invalidity of the personal judgment, we should have no hesitation in holding the assignment sufficient to permit the question to be now raised and argued.
>
> *"Parties are not confined here to the same arguments which were advanced in the courts below upon a Federal question there discussed."* *Id.*, at 197–198 (emphasis added).[3]

_____

[2] The Court has previously relied on issues and arguments not raised in the state court below in order to dispose of a federal question that was properly raised. In *Stanley* v. *Illinois*, 405 U. S. 645, 658 (1972), the Court held that unmarried fathers could not be denied a hearing on parental fitness that was afforded other Illinois parents. Although this issue was not presented in the Illinois courts, the Court found that it could properly be considered: "we dispose of the case on the constitutional premise raised below, reaching the result by a method of analysis readily available to the state court. For the same reason the strictures of *Cardinale* v. *Louisiana*, 394 U. S. 437 (1969), and *Hill* v. *California*, 401 U. S. 797 (1971), have been fully observed." *Id.*, at 658, n. 10. The dissent argued that the Court was deciding a due process claim instead of an equal protection one, but there was no suggestion that it mattered at all that the Court had relied on a different type of equal protection argument.

[3] As the Court explains, *ante*, at 220, n. 2, in *Dewey*, the plaintiff in error argued only that the imposition of personal liability against him violated

Under *Dewey*, which the Court hails as the "fullest treatment of the subject," *ante*, at 219, the exclusionary rule issue is but another argument pertaining to the Fourth Amendment question squarely presented in the Illinois courts.

The presentation and decision of respondents' Fourth Amendment claim fully embraces the argument that due to the nature of the alleged Fourth Amendment violation, the seized evidence should not be excluded. Our decisions concerning the scope of the exclusionary rule cannot be divorced from the Fourth Amendment; they rest on the relationship of Fourth Amendment interests to the objectives of the criminal justice system. See, *e. g.*, *United States* v. *Ceccolini*, 435 U. S. 268 (1978); *Stone* v. *Powell*, 428 U. S. 465 (1976).[4] Similarly, the issues surrounding a proposed good-faith modification are intricately and inseverably tied to the nature of the Fourth Amendment violation: the degree of probable cause, the presence of a warrant, and the clarity of previously announced Fourth Amendment principles all inform the

the Due Process Clause of the Fourteenth Amendment, because he had not received personal notice of the assessment proceedings. In this Court, the plaintiff in error sought to raise a takings argument for the first time. The Court declined to pass on the issue because, although arising from a single factual occurrence, the two claims "are not in anywise necessarily connected." 173 U. S., at 198.

[4] The Court relies on these cases for the surprising assertion that the Fourth Amendment and exclusionary rule questions are "distinct." I had understood the very essence of *Rakas* v. *Illinois*, 439 U. S. 128 (1978), to be that standing to seek exclusion of evidence could not be divorced from substantive Fourth Amendment rights. Past decisions finding that the remedy of exclusion is not always appropriate upon the finding of a Fourth Amendment violation acknowledge the close relationship of the issues. For example, in *United States* v. *Ceccolini* it was said: "The constitutional question under the Fourth Amendment was phrased in *Wong Sun* v. *United States*, 371 U. S. 471 (1963), as whether 'the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." ' " 435 U. S., at 273–274. It is also suprising to learn that the issues in *Stone* v. *Powell* are "distinct" from the Fourth Amendment.

good-faith issue. The Court's own holding that the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for concluding that probable cause existed, *ante*, at 244–245, is itself but a variation on the good-faith theme. See Brief for Petitioner on Reargument 4–26.

As a jurisdictional requirement, I have no doubt that the exclusionary rule question is before us as an indivisible element of the claim that the Constitution requires exclusion of certain evidence seized in violation of the Fourth Amendment. As a prudential matter, I am unmoved by the Court's lengthy discourse as to why it must avoid the question. First, the Court turns on its head the axiom that "'due regard for the appropriate relationship of this Court to state courts,' *McGoldrick* v. *Compagnie Generale Transatlantique*, 309 U. S., at 434–435, demands that those courts be given an opportunity to consider the constitutionality of the actions of state officials," *ante*, at 221. This statement, written to explain why a state statute should not be struck down on federal grounds not raised in the state courts,[5] hardly applies when the question is whether a rule of federal law articulated by this Court should now be narrowed to reduce the scope of federal intrusion into the State's administration of criminal justice. Insofar as modifications of the federal exclusionary

---

[5] Consider the full context of the statement in *McGoldrick* v. *Compagnie Generale Transatlantique*, 309 U. S. 430, 434 (1940):

"In cases coming here from state courts in which a state statute is assailed as unconstitutional, there are reasons of peculiar force which should lead us to refrain from deciding questions not presented or decided in the highest court of the state whose judicial action we are called upon to review. Apart from the reluctance with which every court should proceed to set aside legislation as unconstitutional on grounds not properly presented, due regard for the appropriate relationship of this Court to state courts requires us to decline to consider and decide questions affecting the validity of state statutes not urged or considered there. It is for these reasons that this Court, where the constitutionality of a statute has been upheld in the state court, consistently refuses to consider any grounds of attack not raised or decided in that court."

rule are concerned, the Illinois courts are bound by this Court's pronouncements. Cf. *Oregon* v. *Hass*, 420 U. S. 714, 719 (1975). I see little point in requiring a litigant to request a state court to overrule or modify one of this Court's precedents. Far from encouraging the stability of our precedents, the Court's proposed practice could well undercut *stare decisis.* Either the presentation of such issues to the lower courts will be a completely futile gesture or the lower courts are now invited to depart from this Court's decisions whenever they conclude such a modification is in order.[6]

The Court correctly notes that Illinois may choose to pursue a different course with respect to the state exclusionary rule. If this Court were to formulate a "good-faith" exception to the federal exclusionary rule, the Illinois Supreme Court would be free to consider on remand whether the state exclusionary rule should be modified accordingly. The possibility that it might have relied upon the state exclusionary rule had the "good-faith" question been posed does not constitute independent and adequate state grounds. "The possibility that the state court might have reached the same conclusion if it had decided the question purely as a matter of state law does not create an adequate and independent state ground that relieves this Court of the necessity of considering the federal question." *United Air Lines, Inc.* v. *Mahin,* 410 U. S. 623, 630–631 (1973); *Beecher* v. *Alabama,* 389 U. S. 35, 37, n. 3 (1967); C. Wright, The Law of Federal Courts § 107, pp. 747–748 (4th ed. 1983). Nor does having the state court first decide whether the federal exclusionary rule should be modified—and presentation of the federal question does not insure that the equivalent state-law issue will be

---

[6] The Court observes that "although the Illinois courts applied the federal exclusionary rule, there was never 'any real contest' upon the point." *Ante,* at 223. But the proper forum for a "real contest" on the continued vitality of the exclusionary rule that has developed from our decisions in *Weeks* v. *United States,* 232 U. S. 383 (1914), and *Mapp* v. *Ohio,* 367 U. S. 643 (1961), is this Court.

raised or decided[7]—avoid the unnecessary decision of a federal question. The Court still must reach a federal question to decide the instant case. Thus, in today's opinion, the Court eschews modification of the exclusionary rule in favor of interring the test established by *Aguilar* v. *Texas*, 378 U. S. 108 (1964), and *Spinelli* v. *United States*, 393 U. S. 410 (1969). Nor is the exclusionary rule question avoided—it is simply deferred until "another day."

It also appears that the Court, in disposing of the case, does not strictly follow its own prudential advice. The Illinois Supreme Court found not only a violation of the Fourth Amendment but also of Article I, § 6, of the Illinois Constitution, which also provides assurance against unreasonable searches and seizures. Taking the Court's new prudential standards on their own terms, the Illinois courts should be given the opportunity to consider in the first instance whether a "totality of the circumstances" test should replace the more precise rules of *Aguilar* and *Spinelli*. The Illinois Supreme Court may decide to retain the established test for purposes of the State Constitution just as easily as it could decide to retain an unmodified exclusionary rule.[8]

Finally, the Court correctly notes that a fully developed record is helpful if not indispensable for the decision of many issues. I too resist the decision of a constitutional question

---

[7] Nor is there any reason for the Illinois courts to decide that question in advance of this Court's decision on the federal exclusionary rule. Until the federal rule is modified, the state-law question is entirely academic. The state courts should not be expected to render such purely advisory decisions.

[8] Respondents press this very argument. Brief for Respondents 24–27; Brief for Respondents on Reargument 6. Of course, under traditional principles the possibility that the state court might reach a different conclusion in interpreting the State Constitution does not make it improper for us to decide the federal issue. *Delaware* v. *Prouse*, 440 U. S. 648, 651–653 (1979); *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 568 (1977).

when such guidance is necessary, but the question of whether the exclusionary rule should be modified is an issue of law which obviously goes far beyond and depends little on the subjective good faith of the police officers that searched the Gateses' property. Moreover, the case comes here with a fully developed record as to the actions of the Bloomingdale, Ill., police. If further factual development of whether the officers in this case acted in good faith were important, that issue should logically be considered on remand, following this Court's statement of the proper legal standards.[9]

The Court's straining to avoid coming to grips with the exclusionary rule issue today may be hard for the country to understand—particularly given earlier statements by some Members of the Court.[10] The question has been fully briefed and argued by the parties and *amici curiae*, including the United States.[11] The issue is central to the enforcement of law and the administration of justice throughout the Nation. The Court of Appeals for the second largest Federal Circuit

[9] It also should be noted that the requirement that the good-faith issue be presented to the Illinois courts has little to do with whether the record is complete. I doubt that the raising of the good-faith issue below would have been accompanied by any different record. And this Court may dismiss a writ of certiorari as improvidently granted when the record makes decision of a federal question unwise. See, *e. g.*, *Minnick* v. *California Dept. of Corrections*, 452 U. S. 105 (1981).

[10] In *California* v. *Minjares*, 443 U. S. 916, 928 (1979) (REHNQUIST, J., joined by BURGER, C. J., dissenting from the denial of stay), the author of today's opinion for the Court urged that the parties be directed to brief whether the exclusionary rule should be retained. In *Minjares*, like this case, respondents had raised a Fourth Amendment claim but petitioners had not attacked the validity of the exclusionary rule in the state court. See also *Robbins* v. *California*, 453 U. S. 420, 437 (1981) (REHNQUIST, J., dissenting) (advocating overruling of *Mapp* v. *Ohio, supra*).

[11] Ironically, in *Mapp* v. *Ohio, supra*, petitioners did not ask the Court to partially overrule *Wolf* v. *Colorado*, 338 U. S. 25 (1949). The sole argument to apply the exclusionary rule to the States is found in a single paragraph in an *amicus* brief filed by the American Civil Liberties Union.

254

has already adopted such an exception, *United States* v. *Williams*, 622 F. 2d 830 (CA5 1980) (en banc), cert. denied, 449 U. S. 1127 (1981), and the new Eleventh Circuit is presumably bound by its decision. Several Members of this Court have for some time expressed the need to consider modifying the exclusionary rule, *ante*, at 224, and Congress as well has been active in exploring the question. See The Exclusionary Rule Bills, Hearings on S. 101, S. 751, and S. 1995 before the Subcommittee on Criminal Law of the Senate Committee on the Judiciary, 97th Cong., 1st and 2d Sess. (1981–1982). At least one State has already enacted a good-faith exception. Colo. Rev. Stat. § 16–3–308 (Supp. 1982). Of course, if there is a jurisdictional barrier to deciding the issue, none of these considerations are relevant. But if no such procedural obstacle exists, I see it as our responsibility to end the uncertainty and decide whether the rule will be modified. The question of whether probable cause existed for the issuance of a warrant and whether the evidence seized must be excluded in this case should follow our reconsideration of the framework by which such issues, as they arise from the Fourth Amendment, are to be handled.

II

A

The exclusionary rule is a remedy adopted by this Court to effectuate the Fourth Amendment right of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Although early opinions suggested that the Constitution required exclusion of all illegally obtained evidence, the exclusionary rule "has never been interpreted to proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Stone* v. *Powell*, 428 U. S., at 486. Because of the inherent trustworthiness of seized tangible evidence and the resulting social costs from its loss through suppression, appli-

cation of the exclusionary rule has been carefully "restricted to those areas where its remedial objectives are thought most efficaciously served." *United States* v. *Calandra,* 414 U. S. 338, 348 (1974). Even at criminal trials the exclusionary rule has not been applied indiscriminately to ban all illegally obtained evidence without regard to the costs and benefits of doing so. *Infra,* at 256–257. These developments, born of years of experience with the exclusionary rule in operation, forcefully suggest that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment.

This evolvement in the understanding of the proper scope of the exclusionary rule embraces several lines of cases. First, standing to invoke the exclusionary rule has been limited to situations where the government seeks to use such evidence against the victim of the unlawful search. *Brown* v. *United States,* 411 U. S. 223 (1973); *Alderman* v. *United States,* 394 U. S. 165 (1969); *Wong Sun* v. *United States,* 371 U. S. 471, 491–492 (1963); *Rakas* v. *Illinois,* 439 U. S. 128 (1978).

Second, the rule has not been applied in proceedings other than the trial itself. In *United States* v. *Calandra, supra,* the Court refused to extend the rule to grand jury proceedings. "Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. . . . We therefore decline to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury." 414 U. S., at 351–352. Similarly, in *United States* v. *Janis,* 428 U. S. 433 (1976), the exclusionary rule was not extended to forbid the use in federal civil proceedings of evidence illegally seized by state officials, since the likelihood of deterring unlawful police conduct was not sufficient to outweigh the social costs imposed by the exclusion.

Third, even at a criminal trial, the same analysis has led us to conclude that the costs of excluding probative evidence outweighed the deterrence benefits in several circumstances. We have refused to prohibit the use of illegally seized evidence for the purpose of impeaching a defendant who testifies in his own behalf. *United States* v. *Havens,* 446 U. S. 620 (1980); *Walder* v. *United States,* 347 U. S. 62 (1954). We have also declined to adopt a *"per se* or 'but for' rule" that would make inadmissible any evidence which comes to light through a chain of causation that began with an illegal arrest. *Brown* v. *Illinois,* 422 U. S. 590, 603 (1975). And we have held that testimony of a live witness may be admitted, notwithstanding that the testimony was derived from a concededly unconstitutional search. *United States* v. *Ceccolini,* 435 U. S. 268 (1978). Nor is exclusion required when law enforcement agents act in good-faith reliance upon a statute or ordinance that is subsequently held to be unconstitutional. *United States* v. *Peltier,* 422 U. S. 531 (1975); *Michigan* v. *DeFillippo,* 443 U. S. 31 (1979).[12] Cf. *United States* v. *Caceres,* 440 U. S. 741, 754–757 (1979) (exclusion not

---

[12] To be sure, *Peltier* and *DeFillippo* did not modify the exclusionary rule itself. *Peltier* held that *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), was not to be given retroactive effect; *DeFillippo* upheld the validity of an arrest made in good-faith reliance on an ordinance subsequently declared unconstitutional. The effect of these decisions, of course, was that evidence was not excluded because of the officer's reasonable belief that he was acting lawfully, and the Court's reasoning, as I discuss *infra,* at 260–261, leads inexorably to the more general modification of the exclusionary rule I favor. Indeed, JUSTICE BRENNAN recognized this in his dissent in *Peltier,* 422 U. S., at 551–552.

I recognize that we have held that the exclusionary rule required suppression of evidence obtained in searches carried out pursuant to statutes, not previously declared unconstitutional, which purported to authorize the searches in question without probable cause and without a valid warrant. See, *e. g., Torres* v. *Puerto Rico,* 442 U. S. 465 (1979); *Almeida-Sanchez* v. *United States, supra; Sibron* v. *New York,* 392 U. S. 40 (1968); *Berger* v. *New York,* 388 U. S. 41 (1967). The results in these cases may well be different under a "good-faith" exception to the exclusionary rule.

required of evidence tainted by violation of an executive department's rules concerning electronic eavesdropping).

A similar balancing approach is employed in our decisions limiting the scope of the exclusionary remedy for Fifth Amendment violations, *Oregon* v. *Hass*, 420 U. S. 714 (1975); *Harris* v. *New York*, 401 U. S. 222 (1971); *Michigan* v. *Tucker*, 417 U. S. 433 (1974), and our cases considering whether Fourth Amendment decisions should be applied retroactively, *United States* v. *Peltier, supra*, at 538–539; *Williams* v. *United States*, 401 U. S. 646, 654–655 (1971) (plurality opinion); *Desist* v. *United States*, 394 U. S. 244, 249–250 (1969); *Linkletter* v. *Walker*, 381 U. S. 618, 636–639 (1965). But see *United States* v. *Johnson*, 457 U. S. 537 (1982).

These cases reflect that the exclusion of evidence is not a personal constitutional right but a remedy, which, like all remedies, must be sensitive to the costs and benefits of its imposition. The trend and direction of our exclusionary rule decisions indicate not a lesser concern with safeguarding the Fourth Amendment but a fuller appreciation of the high costs incurred when probative, reliable evidence is barred because of investigative error. The primary cost, of course, is that the exclusionary rule interferes with the truthseeking function of a criminal trial by barring relevant and trustworthy evidence.[13] We will never know how many guilty defendants go free as a result of the rule's operation. But any rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification,

---

[13] The effects of the exclusionary rule are often felt before a case reaches trial. A recent study by the National Institute of Justice of felony arrests in California during the years 1976–1979 "found a major impact of the exclusionary rule on state prosecutions." National Institute of Justice, The Effects of the Exclusionary Rule: A Study in California 2 (1982). The study found that 4.8% of the more than 4,000 felony cases declined for prosecution were rejected because of search and seizure problems. The exclusionary rule was found to have a particularly pronounced effect in drug cases; prosecutors rejected approximately 30% of all felony drug arrests because of search and seizure problems.

and must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness. I do not presume that modification of the exclusionary rule will, by itself, significantly reduce the crime rate—but that is no excuse for indiscriminate application of the rule.

The suppression doctrine entails other costs as well. It would be surprising if the suppression of evidence garnered in good faith, but by means later found to violate the Fourth Amendment, did not deter legitimate as well as unlawful police activities. To the extent the rule operates to discourage police from reasonable and proper investigative actions, it hinders the solution and even the prevention of crime. A tremendous burden is also placed on the state and federal judicial systems. One study reveals that one-third of federal defendants going to trial file Fourth Amendment suppression motions, and 70% to 90% of these involve formal hearings. General Accounting Office, Comptroller General of the United States, Impact of the Exclusionary Rule on Federal Criminal Prosecutions 10 (1979).

The rule also exacts a heavy price in undermining public confidence in the reasonableness of the standards that govern the criminal justice system. "[A]lthough the [exclusionary] rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and the administration of justice." *Stone* v. *Powell*, 428 U. S., at 490–491. As JUSTICE POWELL observed in *Stone* v. *Powell, supra,* at 490: "The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice."

For these reasons, "application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States*

v. *Calandra*, 414 U. S., at 348.[14]   The reasoning of our recent cases strongly suggests that there is insufficient justification to suppress evidence at a criminal trial which was seized in the reasonable belief that the Fourth Amendment was not violated.   The deterrent effect of the exclusionary rule has never been established by empirical evidence, de-

---

[14] Our decisions applying the exclusionary rule have referred to the "imperative of judicial integrity," *Elkins* v. *United States*, 364 U. S. 206, 222 (1960), although recent opinions of the Court make clear that the primary function of the exclusionary rule is to deter violations of the Fourth Amendment, *Stone* v. *Powell*, 428 U. S., at 486; *United States* v. *Janis*, 428 U. S. 433, 446 (1976); *United States* v. *Calandra*, 414 U. S., at 348. I do not dismiss the idea that the integrity of the courts may be compromised when illegally seized evidence is admitted, but I am convinced that the force of the argument depends entirely on the type of search or seizure involved.   At one extreme, there are lawless invasions of personal privacy that shock the conscience, and the admission of evidence so obtained must be suppressed as a matter of due process, entirely aside from the Fourth Amendment.   See, *e. g.*, *Rochin* v. *California*, 342 U. S. 165 (1952).   Also deserving of exclusionary treatment are searches and seizures perpetrated in intentional and flagrant disregard of Fourth Amendment principles. But the question of exclusion must be viewed through a different lens when a Fourth Amendment violation occurs because the police have reasonably erred in assessing the facts, mistakenly conducted a search authorized under a presumably valid statute, or relied in good faith upon a warrant not supported by probable cause.   In these circumstances, the integrity of the courts is not implicated.   The violation of the Fourth Amendment is complete before the evidence is admitted.   Thus, "[t]he primary meaning of 'judicial integrity' in the context of evidentiary rules is that the courts must not commit or encourage violations of the Constitution." *United States* v. *Janis, supra*, at 458, n. 35.   Cf. *United States* v. *Peltier*, 422 U. S. 531, 537 (1975) ("The teaching of these retroactivity cases is that if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'imperative of judicial integrity' is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner").   I am content that the interests in judicial integrity run along with rather than counter to the deterrence concept, and that to focus upon the latter is to promote, not denigrate, the former.

spite repeated attempts. *United States* v. *Janis*, 428 U. S., at 449–453; *Irvine* v. *California*, 347 U. S. 128, 136 (1954). But accepting that the rule deters some police misconduct, it is apparent as a matter of logic that there is little if any deterrence when the rule is invoked to suppress evidence obtained by a police officer acting in the reasonable belief that his conduct did not violate the Fourth Amendment. As we initially observed in *Michigan* v. *Tucker*, 417 U. S., at 447, and reiterated in *United States* v. *Peltier*, 422 U. S., at 539:

> "'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.'"

The Court in *Peltier* continued, *id.,* at 542:

> "If the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."

See also *United States* v. *Janis*, *supra*, at 459, n. 35 ("[T]he officers here were clearly acting in good faith . . . a factor that the Court has recognized reduces significantly the potential deterrent effect of exclusion"). The deterrent value of the exclusionary sanction is most effective when officers engage in searches and seizures under circumstances "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown* v. *Illinois*, 422 U. S., at 610–611 (POWELL, J., concurring in part). On the

other hand, when officers perform their tasks in the good-faith belief that their action comported with constitutional requirements, the deterrent function of the exclusionary rule is so minimal, if not nonexistent, that the balance clearly favors the rule's modification.[15]

---

[15] It has been suggested that the deterrence function of the exclusionary rule has been understated by viewing the rule as aimed at special deterrence, when, in fact, the exclusionary rule is directed at "affecting the wider audience of law enforcement officials and society at large." 1 W. LaFave, Search and Seizure 6 (1983 Supp.). See also Mertens & Wasserstrom, The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law, 70 Geo. L. J. 365, 399–401 (1981). I agree that the exclusionary rule's purpose is not only, or even primarily, to deter the individual police officer involved in the instant case. It appears that this objection assumes that the proposed modification of the exclusionary rule will turn only on the subjective "good faith" of the officer. Grounding the modification in objective reasonableness, however, retains the value of the exclusionary rule as an incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment. *Dunaway* v. *New York*, 442 U. S. 200, 221 (1979) (STEVENS, J., concurring).

Indeed, the present indiscriminate application of the exclusionary rule may hinder the educative and deterrent function of the suppression remedy. "Instead of disciplining their employees, police departments generally have adopted the attitude that the courts cannot be satisfied, that the rules are hopelessly complicated and subject to change, and that the suppression of evidence is the court's problem and not the departments'." Kaplan, The Limits of the Exclusionary Rule, 26 Stan. L. Rev. 1027, 1050 (1974). If evidence is suppressed only when a law enforcement officer should have known that he was violating the Fourth Amendment, police departments may look more seriously at the officer's misconduct when suppression is invoked. Moreover, by providing that evidence gathered in good-faith reliance on a reasonable rule will not be excluded, a good-faith exception creates an incentive for police departments to formulate rules governing activities of officers in the search-and-seizure area. Many commentators, including proponents of the exclusionary sanction, recognize that the formulation of such rules by police departments, and the training necessary to implement these guidelines in practice, are perhaps the most effective means of protecting Fourth Amendment rights. See K. Davis, Discretionary Justice (1969); McGowan, Rule-Making and the Police, 70 Mich. L. Rev. 659 (1972); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 416–431 (1974).

## B

There are several types of Fourth Amendment violations that may be said to fall under the rubric of "good faith." "[T]here will be those occasions where the trial or appellate court will disagree on the issue of probable cause, no matter how reasonable the grounds for arrest appeared to the officer and though reasonable men could easily differ on the question. It also happens that after the events at issue have occurred, the law may change, dramatically or ever so slightly, but in any event sufficiently to require the trial judge to hold that there was not probable cause to make the arrest and to seize the evidence offered by the prosecution. . . ." *Stone* v. *Powell*, 428 U. S., at 539–540 (WHITE, J., dissenting). The argument for a good-faith exception is strongest, however, when law enforcement officers have reasonably relied on a judicially issued search warrant.

This Court has never set forth a rationale for applying the exclusionary rule to suppress evidence obtained pursuant to a search warrant; it has simply done so without considering whether Fourth Amendment interests will be advanced. It is my view that they generally will not be. When officers have dutifully obtained a search warrant from a judge or magistrate, and execute the warrant as directed by its terms, exclusion of the evidence thus obtained cannot be expected to deter future reliance on such warrants. The warrant is prima facie proof that the officers acted reasonably in conducting the search or seizure; "[o]nce the warrant issues, there is literally nothing more that the policeman can do in seeking to comply with the law." *Stone* v. *Powell, supra,* at 498 (BURGER, C. J., concurring).[16] As JUSTICE STEVENS

---

[16] The Attorney General's Task Force on Violent Crime concluded that the situation in which an officer relies on a duly authorized warrant "is a particularly compelling example of good faith. A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions. Accordingly, we believe that there should be a rule which states that evidence obtained pursuant to and

put it in writing for the Court in *United States* v. *Ross*, 456 U. S. 798, 823, n. 32 (1982): "[A] warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." Nevertheless, the warrant may be invalidated because of a technical defect or because, as in this case, the judge issued a warrant on information later determined to fall short of probable cause. Excluding evidence for these reasons can have no possible deterrent effect on future police conduct, unless it is to make officers less willing to do their duty. Indeed, applying the exclusionary rule to warrant searches may well reduce incentives for police to utilize the preferred warrant procedure when a warrantless search may be permissible under one of the established exceptions to the warrant requirement. See *ante*, at 236; *Brown* v. *Illinois*, 422 U. S., at 611, and n. 3 (POWELL, J., concurring in part); P. Johnson, New Approaches to Enforcing the Fourth Amendment 11 (unpublished paper, 1978). See also *United States* v. *United States District Court*, 407 U. S. 297, 316–317 (1972); *United States* v. *Ventresca*, 380 U. S. 102, 106–107 (1965).

Opponents of the proposed "reasonable belief" exception suggest that such a modification would allow magistrates and judges to flout the probable-cause requirements in issuing warrants. This is a novel concept: the exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges. Magistrates must be neutral and detached from law enforcement operations and I would not presume that a modification of the exclusionary rule will lead magistrates to abdicate their responsibility to apply the law.[17] In any event, I would apply the exclusion-

---

within the scope of a warrant is prima facie the result of good faith on the part of the officer seizing the evidence." U. S. Dept. of Justice, Attorney General's Task Force on Violent Crime, Final Report 55 (1981).

[17] Much is made of *Shadwick* v. *City of Tampa*, 407 U. S. 345 (1972), where we held that magistrates need not be legally trained. *Shadwick*'s holding was quite narrow. First, the Court insisted that "an issuing mag-

ary rule when it is plainly evident that a magistrate or judge had no business issuing a warrant. See, e. g., *Aguilar* v. *Texas*, 378 U. S. 108 (1964); *Nathanson* v. *United States*, 290 U. S. 41 (1933). Similarly, the good-faith exception would not apply if the material presented to the magistrate or judge is false or misleading, *Franks* v. *Delaware*, 438 U. S. 154 (1978), or so clearly lacking in probable cause that no well-trained officer could reasonably have thought that a warrant should issue.

Another objection is that a reasonable-belief exception will encompass all searches and seizures on the frontier of the Fourth Amendment and that such cases will escape review on the question of whether the officer's action was permissible, denying needed guidance from the courts and freezing Fourth Amendment law in its present state. These fears are unjustified. The premise of the argument is that a court must first decide the reasonable-belief issue before turning to the question of whether a Fourth Amendment violation has occurred. I see no need for such an inflexible practice. When a Fourth Amendment case presents a novel question of law whose resolution is necessary to guide future action by law enforcement officers and magistrates, there is sufficient reason for the Court to decide the violation issue *before* turning to the good-faith question. Indeed, it may be difficult to

---

istrate must meet two tests. He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search." *Id.*, at 350. Second, in *Shadwick*, the Court Clerk's authority extended only to the relatively straightforward task of issuing arrest warrants for breach of municipal ordinances. To issue search warrants, an individual must be capable of making the probable-cause judgments involved. In this regard, I reject the Court's insinuation that it is too much to expect that persons who issue warrants remain abreast of judicial refinements of probable cause. *Ante*, at 235. Finally, as indicated in text, I do not propose that a warrant clearly lacking a basis in probable cause can support a "good-faith" defense to invocation of the exclusionary rule.

determine whether the officers acted reasonably until the Fourth Amendment issue is resolved.[18]   In other circumstances, however, a suppression motion poses no Fourth Amendment question of broad import—the issue is simply whether the facts in a given case amounted to probable cause—in these cases, it would be prudent for a reviewing court to immediately turn to the question of whether the officers acted in good faith.   Upon finding that they had, there would generally be no need to consider the probable-cause question.   I doubt that our Fourth Amendment jurisprudence would suffer thereby.   It is not entirely clear to me that the law in this area has benefited from the constant pressure of fully litigated suppression motions.   The result usually has been that initially bright-line rules have disappeared in a sea of ever-finer distinctions.   Moreover, there is much to be said for having Fourth Amendment jurispru-

---

[18] Respondents and some *amici* contend that this practice would be inconsistent with the Art. III requirement of an actual case or controversy.   I have no doubt that a defendant who claims that he has been subjected to an unlawful search or seizure and seeks suppression of the evidentiary fruits thereof raises a live controversy within the Art. III authority of federal courts to adjudicate.   It is fully appropriate for a court to decide whether there has been a wrong before deciding what remedy to impose.   When questions of good-faith immunity have arisen under 42 U. S. C. § 1983, we have not been constrained to reach invariably the immunity question before the violation issue.   Compare *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975) (finding constitutional violation and remanding for consideration of good-faith defense), with *Procunier* v. *Navarette,* 434 U. S. 555, 566, n. 14 (1978) (finding good-faith defense first).   Similarly, we have exercised discretion at times in deciding the merits of a claim even though the error was harmless, while on other occasions resolving the case solely by reliance on the harmless-error doctrine.   Compare *Milton* v. *Wainwright,* 407 U. S. 371, 372 (1972) (declining to decide whether admission of confession was constitutional violation because error, if any, was harmless beyond a reasonable doubt), with *Coleman* v. *Alabama,* 399 U. S. 1 (1970) (upholding right to counsel at preliminary hearing and remanding for harmless-error determination).

dence evolve in part, albeit perhaps at a slower pace, in other settings.[19]

Finally, it is contended that a good-faith exception will be difficult to apply in practice. This concern appears grounded in the assumption that courts would inquire into the subjective belief of the law enforcement officers involved. I would eschew such investigations. "[S]ending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources." *Massachusetts* v. *Painten*, 389 U. S. 560, 565 (1968) (WHITE, J., dissenting). Moreover, "[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." *Scott* v. *United States*, 436 U. S. 128, 136 (1978). Just last Term, we modified the qualified immunity public officials enjoy in suits seeking damages against federal officials for alleged deprivations of constitutional rights, eliminating the subjective component of the standard. See *Harlow* v. *Fitzgerald*, 457 U. S. 800 (1982). Although

---

[19] For example, a pattern or practice of official conduct that is alleged to violate Fourth Amendment rights may be challenged by an aggrieved individual in a suit for declaratory or injunctive relief. See, *e. g., Zurcher* v. *Stanford Daily*, 436 U. S. 547 (1978). (Of course, there are limits on the circumstances in which such actions will lie. *Rizzo* v. *Goode*, 423 U. S. 362 (1976); *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983).) Although a municipality is not liable under 42 U. S. C. § 1983 on a theory of *respondeat superior*, local governing bodies are subject to suit for constitutional torts resulting from implementation of local ordinances, regulations, policies, or even customary practices. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978). Such entities enjoy no immunity defense that might impede resolution of the substantive constitutional issue. *Owen* v. *City of Independence*, 445 U. S. 622 (1980). In addition, certain state courts may continue to suppress, as a matter of state law, evidence in state trials for any Fourth Amendment violation. These cases would likely provide a sufficient supply of state criminal cases in which to resolve unsettled questions of Fourth Amendment law. As a final alternative, I would entertain the possibility of according the benefits of a new Fourth Amendment rule to the party in whose case the rule is first announced. See *Stovall* v. *Denno*, 388 U. S. 293, 301 (1967).

searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, I would measure the reasonableness of a particular search or seizure only by objective standards. Even for warrantless searches, the requirement should be no more difficult to apply than the closely related good-faith test which governs civil suits under 42 U. S. C. § 1983. In addition, the burden will likely be offset by the reduction in the number of cases which will require elongated considerations of the probable-cause question, and will be greatly outweighed by the advantages in limiting the bite of the exclusionary rule to the field in which it is most likely to have its intended effects.

## III

Since a majority of the Court deems it inappropriate to address the good-faith issue, I briefly address the question that the Court does reach—whether the warrant authorizing the search and seizure of respondents' car and home was constitutionally valid. Abandoning the "two-pronged test" of *Aguilar* v. *Texas,* 378 U. S. 108 (1964), and *Spinelli* v. *United States,* 393 U. S. 410 (1969), the Court upholds the validity of the warrant under a new "totality of the circumstances" approach. Although I agree that the warrant should be upheld, I reach this conclusion in accordance with the *Aguilar-Spinelli* framework.

## A

For present purposes, the *Aguilar-Spinelli* rules can be summed up as follows. First, an affidavit based on an informant's tip, standing alone, cannot provide probable cause for issuance of a warrant unless the tip includes information that apprises the magistrate of the informant's basis for concluding that the contraband is where he claims it is (the "basis of knowledge" prong), *and* the affiant informs the magistrate of his basis for believing that the informant is credible (the "veracity" prong). *Aguilar, supra,* at 114;

*Spinelli, supra,* at 412–413, 416.[20]   Second, if a tip fails under either or both of the two prongs, probable cause may yet be established by independent police investigatory work that corroborates the tip to such an extent that it supports "both the inference that the informer was generally trustworthy and that he made his charge . . . on the basis of information obtained in a reliable way." *Spinelli, supra,* at 417.   In instances where the officers rely on corroboration, the ultimate question is whether the corroborated tip "is as trustworthy as a tip which would pass *Aguilar*'s tests without independent corroboration."   393 U. S., at 415.

In the present case, it is undisputed that the anonymous tip, by itself, did not furnish probable cause.   The question is whether those portions of the affidavit describing the results of the police investigation of the respondents, when considered in light of the tip, "would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed." *Spinelli, supra,* at 418.   The Illinois Supreme Court concluded that the corroboration was insufficient to permit such a ripening.   85 Ill. 2d 376, 387, 423 N. E. 2d 887, 892 (1981).   The court reasoned as follows:

> "[T]he nature of the corroborating evidence in this case would satisfy neither the 'basis of knowledge' nor the

---

[20] The "veracity" prong is satisfied by a recitation in the affidavit that the informant previously supplied accurate information to the police, see *McCray* v. *Illinois,* 386 U. S. 300, 303–304 (1967), or by proof that the informant gave his information against his penal interest, see *United States* v. *Harris,* 403 U. S. 573, 583–584 (1971) (plurality opinion).   The "basis of knowledge" prong is satisfied by a statement from the informant that he personally observed the criminal activity, or, if he came by the information indirectly, by a satisfactory explanation of why his sources were reliable, or, in the absence of a statement detailing the manner in which the information was gathered, by a description of the accused's criminal activity in sufficient detail that the magistrate may infer that the informant is relying on something more substantial than casual rumor or an individual's general reputation.   *Spinelli* v. *United States,* 393 U. S., at 416.

'veracity' prong of *Aguilar*. Looking to the affidavit submitted as support for Detective Mader's request that a search warrant issue, we note that the corroborative evidence here was only of clearly innocent activity. Mader's independent investigation revealed only that Lance and Sue Gates lived on Greenway Drive; that Lance Gates booked passage on a flight to Florida; that upon arriving he entered a room registered to his wife; and that he and his wife left the hotel together by car. The corroboration of innocent activity is insufficient to support a finding of probable cause." *Id.*, at 390, 423 N. E. 2d, at 893.

In my view, the lower court's characterization of the Gateses' activity here as totally "innocent" is dubious. In fact, the behavior was quite suspicious. I agree with the Court, *ante*, at 243, that Lance Gates' flight to West Palm Beach, an area known to be a source of narcotics, the brief overnight stay in a motel, and apparent immediate return north, suggest a pattern that trained law enforcement officers have recognized as indicative of illicit drug-dealing activity.[21]

Even, however, had the corroboration related only to completely innocuous activities, this fact alone would not preclude the issuance of a valid warrant. The critical issue is not whether the activities observed by the police are innocent or suspicious. Instead, the proper focus should be on whether the actions of the suspects, whatever their nature, give rise to an inference that the informant is credible and that he obtained his information in a reliable manner.

Thus, in *Draper* v. *United States*, 358 U. S. 307 (1959), an informant stated on September 7 that Draper would be carrying narcotics when he arrived by train in Denver on the morning of September 8 or September 9. The informant also provided the police with a detailed physical description

---

[21] See *United States* v. *Mendenhall*, 446 U. S. 544, 562 (1980) (POWELL, J., concurring in part and concurring in judgment).

of the clothes Draper would be wearing when he alighted from the train. The police observed Draper leaving a train on the morning of September 9, and he was wearing the precise clothing described by the informant. The Court held that the police had probable cause to arrest Draper at this point, even though the police had seen nothing more than the totally innocent act of a man getting off a train carrying a briefcase. As we later explained in *Spinelli*, the important point was that the corroboration showed both that the informant was credible, *i. e.*, that he "had not been fabricating his report out of whole cloth," *Spinelli*, 393 U. S., at 417, and that he had an adequate basis of knowledge for his allegations, "since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way." *Id.*, at 417–418. The fact that the informant was able to predict, two days in advance, the exact clothing Draper would be wearing dispelled the possibility that his tip was just based on rumor or "an offhand remark heard at a neighborhood bar." *Id.*, at 417. Probably Draper had planned in advance to wear these specific clothes so that an accomplice could identify him. A clear inference could therefore be drawn that the informant was either involved in the criminal scheme himself or that he otherwise had access to reliable, inside information.[22]

---

[22] Thus, as interpreted in *Spinelli*, the Court in *Draper* held that there was probable cause because "the kind of information related by the informant [was] not generally sent ahead of a person's arrival in a city except to those who are intimately connected with making careful arrangements for meeting him." *Spinelli, supra*, at 426 (WHITE, J., concurring). As I said in *Spinelli*, the conclusion that *Draper* itself was based on this fact is far from inescapable. Prior to *Spinelli*, *Draper* was susceptible to the interpretation that it stood for the proposition that "the existence of the tenth and critical fact is made sufficiently probable to justify the issuance of a warrant by verifying nine other facts coming from the same source." *Spinelli, supra*, at 426–427 (WHITE, J., concurring). But it now seems clear that the Court in *Spinelli* rejected this reading of *Draper*.

JUSTICE BRENNAN, *post*, at 280, n. 3, 281–282, erroneously interprets my *Spinelli* concurrence as espousing the view that "corroboration of cer-

As in *Draper*, the police investigation in the present case satisfactorily demonstrated that the informant's tip was as trustworthy as one that would alone satisfy the *Aguilar* tests. The tip predicted that Sue Gates would drive to Florida, that Lance Gates would fly there a few days after May 3, and that Lance would then drive the car back. After the police corroborated these facts,[23] the judge could reasonably have inferred, as he apparently did, that the informant, who had specific knowledge of these unusual travel plans, did not make up his story and that he obtained his information in a reliable way. It is theoretically possible, as respondents insist, that the tip could have been supplied by a "vindictive travel agent" and that the Gateses' activities, although unusual, might not have been unlawful.[24] But *Aguilar* and *Spinelli*, like our other cases, do not require that certain guilt be established before a warrant may properly be issued. "[O]nly the probability, and not a prima facie show-

---

tain details in a tip may be sufficient to satisfy the veracity, but not the basis of knowledge, prong of *Aguilar*." Others have made the same mistake. See, *e. g.*, Comment, 20 Am. Crim. L. Rev. 99, 105 (1982). I did not say that corroboration could *never* satisfy the "basis of knowledge" prong. My concern was, and still is, that the prong might be deemed satisfied on the basis of corroboration of information that does not in any way suggest that the informant had an adequate basis of knowledge for his report. If, however, as in *Draper*, the police corroborate information from which it can be inferred that the informant's tip was grounded on inside information, this corroboration is sufficient to satisfy the "basis of knowledge" prong. *Spinelli*, 393 U. S., at 426 (WHITE, J., concurring). The rules would indeed be strange if, as JUSTICE BRENNAN suggests, *post*, at 284, the "basis of knowledge" prong could be satisfied by detail in the tip alone, but not by independent police work.

[23] JUSTICE STEVENS is correct, *post*, at 291, that one of the informant's predictions proved to be inaccurate. However, I agree with the Court, *ante*, at 245, n. 14, that an informant need not be infallible.

[24] It is also true, as JUSTICE STEVENS points out, *post*, at 292, n. 3, that the fact that respondents were last seen leaving West Palm Beach on a northbound interstate highway is far from conclusive proof that they were heading directly to Bloomingdale.

ing, of criminal activity is the standard of probable cause." *Spinelli, supra,* at 419 (citing *Beck* v. *Ohio,* 379 U. S. 89, 96 (1964)). I therefore conclude that the judgment of the Illinois Supreme Court invalidating the warrant must be reversed.

## B

The Court agrees that the warrant was valid, but, in the process of reaching this conclusion, it overrules the *Aguilar-Spinelli* tests and replaces them with a "totality of the circumstances" standard. As shown above, it is not at all necessary to overrule *Aguilar-Spinelli* in order to reverse the judgment below. Therefore, because I am inclined to believe that, when applied properly, the *Aguilar-Spinelli* rules play an appropriate role in probable-cause determinations, and because the Court's holding may foretell an evisceration of the probable-cause standard, I do not join the Court's holding.

The Court reasons, *ante,* at 233, that the "veracity" and "basis of knowledge" tests are not independent, and that a deficiency as to one can be compensated for by a strong showing as to the other. Thus, a finding of probable cause may be based on a tip from an informant "known for the unusual reliability of his predictions" or from "an unquestionably honest citizen," even if the report fails thoroughly to set forth the basis upon which the information was obtained. *Ibid.* If this is so, then it must follow *a fortiori* that "the affidavit of an officer, known by the magistrate to be honest and experienced, stating that [contraband] is located in a certain building" must be acceptable. *Spinelli,* 393 U. S., at 424 (WHITE, J., concurring). It would be "quixotic" if a similar statement from an honest informant, but not one from an honest officer, could furnish probable cause. *Ibid.* But we have repeatedly held that the unsupported assertion or belief of an officer does not satisfy the probable-cause requirement. See, *e. g., Whiteley* v. *Warden,* 401 U. S. 560, 564–565

(1971); *Jones* v. *United States*, 362 U. S. 257, 269 (1960); *Nathanson* v. *United States*, 290 U. S. 41 (1933).[25] Thus, this portion of today's holding can be read as implicitly rejecting the teachings of these prior holdings.

The Court may not intend so drastic a result. Indeed, the Court expressly reaffirms, *ante*, at 239, the validity of cases such as *Nathanson* that have held that, no matter how reliable the affiant-officer may be, a warrant should not be issued unless the affidavit discloses supporting facts and circumstances. The Court limits these cases to situations involving affidavits containing only "bare conclusions" and holds that, if an affidavit contains anything more, it should be left to the issuing magistrate to decide, based solely on "practical-[ity]" and "common sense," whether there is a fair probability that contraband will be found in a particular place. *Ante*, at 238–239.

Thus, as I read the majority opinion, it appears that the question whether the probable-cause standard is to be diluted is left to the common-sense judgments of issuing magistrates. I am reluctant to approve any standard that does not expressly require, as a prerequisite to issuance of a warrant, some showing of facts from which an inference may be drawn that the informant is credible and that his information was obtained in a reliable way. The Court is correctly concerned with the fact that some lower courts have been applying *Aguilar-Spinelli* in an unduly rigid manner.[26] I believe, however, that with clarification of the rule of corroborating

---

[25] I have already indicated my view, *supra*, at 263–264, that such a "bare-bones" affidavit could not be the basis for a good-faith issuance of a warrant.

[26] *Bridger* v. *State*, 503 S. W. 2d 801 (Tex. Crim. App. 1974), and *People* v. *Palanza*, 55 Ill. App. 3d 1028, 371 N. E. 2d 687 (1978), which the Court describes *ante*, at 234, n. 9, appear to me to be excellent examples of overly technical applications of the *Aguilar-Spinelli* standard. The holdings in these cases could easily be disapproved without reliance on a "totality of the circumstances" analysis.

information, the lower courts are fully able to properly interpret *Aguilar-Spinelli* and avoid such unduly rigid applications. I may be wrong; it ultimately may prove to be the case that the only profitable instruction we can provide to magistrates is to rely on common sense. But the question whether a particular anonymous tip provides the basis for issuance of a warrant will often be a difficult one, and I would at least attempt to provide more precise guidance by clarifying *Aguilar-Spinelli* and the relationship of those cases with *Draper* before totally abdicating our responsibility in this area. Hence, I do not join the Court's opinion rejecting the *Aguilar-Spinelli* rules.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Although I join JUSTICE STEVENS' dissenting opinion and agree with him that the warrant is invalid even under the Court's newly announced "totality of the circumstances" test, see *post*, at 294–295, and n. 8, I write separately to dissent from the Court's unjustified and ill-advised rejection of the two-prong test for evaluating the validity of a warrant based on hearsay announced in *Aguilar* v. *Texas*, 378 U. S. 108 (1964), and refined in *Spinelli* v. *United States*, 393 U. S. 410 (1969).

I

The Court's current Fourth Amendment jurisprudence, as reflected by today's unfortunate decision, patently disregards Justice Jackson's admonition in *Brinegar* v. *United States*, 338 U. S. 160 (1949):

"[Fourth Amendment rights] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart.

Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. . . .

"But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court." *Id.*, at 180–181 (dissenting opinion).

In recognition of the judiciary's role as the only effective guardian of Fourth Amendment rights, this Court has developed over the last half century a set of coherent rules governing a magistrate's consideration of a warrant application and the showings that are necessary to support a finding of probable cause. We start with the proposition that a neutral and detached magistrate, and not the police, should determine whether there is probable cause to support the issuance of a warrant. In *Johnson* v. *United States*, 333 U. S. 10 (1948), the Court stated:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Id.*, at 13–14 (footnote omitted).

See also *Whiteley* v. *Warden*, 401 U. S. 560, 564 (1971); *Spinelli* v. *United States*, *supra*, at 415; *United States* v. *Ventresca*, 380 U. S. 102, 109 (1965); *Aguilar* v. *Texas*, *supra*, at 111; *Jones* v. *United States*, 362 U. S. 257, 270–271

(1960); *Giordenello* v. *United States*, 357 U. S. 480, 486 (1958); *United States* v. *Lefkowitz*, 285 U. S. 452, 464 (1932).

In order to emphasize the magistrate's role as an independent arbiter of probable cause and to insure that searches or seizures are not effected on less than probable cause, the Court has insisted that police officers provide magistrates with the underlying facts and circumstances that support the officers' conclusions. In *Nathanson* v. *United States*, 290 U. S. 41 (1933), the Court held invalid a search warrant that was based on a customs agent's "mere affirmation of suspicion and belief without any statement of adequate supporting facts." *Id.*, at 46. The Court stated: "Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor from facts or circumstances presented to him under oath or affirmation. Mere affirmance of belief or suspicion is not enough." *Id.*, at 47.

In *Giordenello* v. *United States*, *supra*, the Court reviewed an arrest warrant issued under the Federal Rules of Criminal Procedure based on a complaint sworn to by a Federal Bureau of Narcotics agent. *Id.*, at 481.[1] Based on the agent's testimony at the suppression hearing, the Court noted that "until the warrant was issued . . . [the agent's] suspicions of petitioner's guilt derived entirely from information given him by law enforcement officers and other persons in Houston, none of whom either appeared before the Commissioner or submitted affidavits." *Id.*, at 485. The Court found it unnecessary to decide whether a warrant could be based solely on hearsay information, for the complaint was "defective in not providing a sufficient basis upon which a

---

[1] Although the warrant was issued under the Federal Rules of Criminal Procedure, the Court stated that "[t]he provisions of these Rules must be read in light of the constitutional requirements they implement." 357 U. S., at 485. See *Aguilar* v. *Texas*, 378 U. S. 108, 112, n. 3 (1964) ("The principles announced in *Giordenello* derived . . . from the Fourth Amendment, and not from our supervisory power").

finding of probable cause could be made." *Ibid.* In particular, the complaint contained no affirmative allegation that the agent spoke with personal knowledge nor did it indicate any sources for the agent's conclusion. *Id.*, at 486. The Court expressly rejected the argument that these deficiencies could be cured by "the Commissioner's reliance upon a presumption that the complaint was made on the personal knowledge of the complaining officer." *Ibid.*

As noted, the Court did not decide the hearsay question lurking in *Giordenello.* The use of hearsay to support the issuance of a warrant presents special problems because informants, unlike police officers, are not regarded as presumptively reliable or honest. Moreover, the basis for an informant's conclusions is not always clear from an affidavit that merely reports those conclusions. If the conclusory allegations of a police officer are insufficient to support a finding of probable cause, surely the conclusory allegations of an informant should *a fortiori* be insufficient.

In *Jones* v. *United States, supra,* the Court considered "whether an affidavit which sets out personal observations relating to the existence of cause to search is to be deemed insufficient by virtue of the fact that it sets out not the affiant's observations but those of another." *Id.*, at 269. The Court held that hearsay information can support the issuance of a warrant "so long as a substantial basis for crediting the hearsay is presented." *Ibid.* The Court found that there was a substantial basis for crediting the hearsay involved in *Jones.* The informant's report was based on the informant's personal knowledge, and the informant previously had provided accurate information. Moreover, the informant's story was corroborated by other sources. Finally, the defendant was known to the police to be a narcotics user. *Id.*, at 271.

*Aguilar* v. *Texas,* 378 U. S. 108 (1964), merely made explicit what was implicit in *Jones.* In considering a search warrant based on hearsay, the Court reviewed *Nathanson*

and *Giordenello* and noted the requirement established by those cases that an officer provide the magistrate with the underlying facts or circumstances that support the officer's conclusion that there is probable cause to justify the issuance of a warrant. The Court stated:

> "The vice in the present affidavit is at least as great as in *Nathanson* and *Giordenello*. Here, the 'mere conclusion' that petitioner possessed narcotics was not even that of the affiant himself; it was that of an unidentified informant. The affidavit here not only 'contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein,' it does not even contain an 'affirmative allegation' that the affiant's unidentified source 'spoke with personal knowledge.' For all that appears, the source here merely suspected, believed or concluded that there were narcotics in petitioner's possession. The magistrate here certainly could not 'judge for himself the persuasiveness of the facts relied on . . . to show probable cause.' He necessarily accepted 'without question' the informant's 'suspicion,' 'belief' or 'mere conclusion.'" 378 U. S., at 113–114 (footnote omitted).[2]

While recognizing that a warrant may be based on hearsay, the Court established the following standard:

> "[T]he magistrate must be informed of some of the underlying circumstances from which the informant con-

---

[2] The Court noted that approval of the affidavit before it "would open the door to easy circumvention of the rule announced in *Nathanson* and *Giordenello*." 378 U. S., at 114, n. 4. The Court stated:

"A police officer who arrived at the 'suspicion,' 'belief' or 'mere conclusion' that narcotics were in someone's possession could not obtain a warrant. But he could convey this conclusion to another police officer, who could then secure the warrant by swearing that he had 'received reliable information from a credible person' that the narcotics were in someone's possession." *Ibid.*

cluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime' . . . or, as in this case, by an unidentified informant." *Id.*, at 114–115 (footnote omitted).

The *Aguilar* standard was refined in *Spinelli* v. *United States*, 393 U. S. 410 (1969). In *Spinelli*, the Court reviewed a search warrant based on an affidavit that was "more ample," *id.*, at 413, than the one in *Aguilar*. The affidavit in *Spinelli* contained not only a tip from an informant, but also a report of an independent police investigation that allegedly corroborated the informant's tip. 393 U. S., at 413. Under these circumstances, the Court stated that it was "required to delineate the manner in which *Aguilar*'s two-pronged test should be applied . . . ." *Ibid.*

The Court held that the *Aguilar* test should be applied to the tip, and approved two additional ways of satisfying that test. First, the Court suggested that if the tip contained sufficient detail describing the accused's criminal activity it might satisfy *Aguilar*'s basis of knowledge prong. 393 U. S., at 416. Such detail might assure the magistrate that he is "relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Ibid.* Although the tip in the case before it did not meet this standard, "[t]he detail provided by the informant in *Draper* v. *United States*, 358 U. S. 307 (1959), provide[d] a suitable benchmark," *ibid.*, because "[a] magistrate, when confronted with such detail, could reasonably infer that the informant

had gained his information in a reliable way." *Id.*, at 417 (footnote omitted).[3]

Second, the Court stated that police corroboration of the details of a tip could provide a basis for satisfying *Aguilar*.

---

[3] There is some tension between *Draper* v. *United States*, 358 U. S. 307 (1959), and *Aguilar*. In *Draper*, the Court considered the validity of a warrantless arrest based on an informant's tip and police corroboration of certain details of the tip. The informant, who in the past had always given accurate and reliable information, told the police that Draper was peddling narcotics. The informant later told the police that Draper had left for Chicago by train to pick up some heroin and would return by train on the morning of one of two days. The informant gave the police a detailed physical description of Draper and of the clothing he was wearing. The informant also said that Draper would be carrying a tan zipper bag and that he walked very fast. 358 U. S., at 309.

On the second morning specified by the informant, the police saw a man "having the exact physical attributes and wearing the precise clothing described by [the informant], alight from an incoming Chicago train and start walking 'fast' toward the exit." *Id.*, at 309–310. The man was carrying a tan zipper bag. The police arrested him and searched him incident to the arrest. *Id.*, at 310.

The Court found that the arrest had been based on probable cause. Having verified every detail of the tip "except whether [Draper] had accomplished his mission and had the three ounces of heroin on his person or in his bag," *id.*, at 313, the police "had 'reasonable grounds' to believe that the remaining unverified bit of [the informant's] information . . . was likewise true." *Ibid.*

There is no doubt that the tip satisfied *Aguilar*'s veracity prong. The informant had given accurate information in the past. Moreover, under *Spinelli*, the police corroborated most of the details of the informant's tip. See *Spinelli* v. *United States*, 393 U. S., at 417; *id.*, at 426–427 (WHITE, J., concurring); *infra*, at 281, and n. 4. There is some question, however, about whether the tip satisfied *Aguilar*'s basis of knowledge prong. The fact that an informant is right about most things may suggest that he is credible, but it does not establish that he has acquired his information in a reliable way. See *Spinelli* v. *United States*, *supra*, at 426–427 (WHITE, J., concurring). *Spinelli*'s "self-verifying detail" element resolves this tension. As one commentator has suggested, "under *Spinelli*, the *Draper* decision is sound as applied to its facts." Note, The Informer's Tip As Probable Cause for Search or Arrest, 54 Cornell L. Rev. 958, 964, n. 34 (1969).

393 U. S., at 417. The Court's opinion is not a model of clarity on this issue since it appears to suggest that corroboration can satisfy both the basis of knowledge and veracity prongs of *Aguilar.* 393 U. S., at 417–418.[4] JUSTICE WHITE's concurring opinion, however, points the way to a proper reading of the Court's opinion. After reviewing the Court's decision in *Draper* v. *United States,* 358 U. S. 307 (1959), JUSTICE WHITE concluded that "[t]he thrust of *Draper* is not that the verified facts have independent significance with respect to proof of [another unverified fact]." 393 U. S., at 427. In his view, "[t]he argument instead relates to the reliability of the source: because an informant is right about some things, he is more probably right about other facts, usually the critical, unverified facts." *Ibid.* JUSTICE WHITE then pointed out that prior cases had rejected "the notion that the past

---

[4] The Court stated that the Federal Bureau of Investigation's independent investigative efforts could not "support both the inference that the informer was generally trustworthy and that he had made his charge against Spinelli on the basis of information obtained in a reliable way." *Spinelli* v. *United States, supra,* at 417. The Court suggested that *Draper* again provided "a relevant comparison." 393 U. S., at 417. Once the police had corroborated most of the details of the tip in *Draper* "[i]t was . . . apparent that the informant had not been fabricating his report out of whole cloth; since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way, it was perfectly clear that probable cause had been established." 393 U. S., at 417–418.

It is the Court's citation of *Draper* which creates most of the confusion. The informant's credibility was not at issue in *Draper* irrespective of the corroboration of the details of his tip. See n. 3, *supra.* The Court's opinion, therefore, might be read as suggesting that corroboration also could satisfy *Aguilar's* basis of knowledge test. I think it is more likely, however, especially in view of the discussion *infra,* this page and 282, that the Court simply was discussing an alternative means of satisfying *Aguilar's* veracity prong, using the facts of *Draper* as an example, and relying on its earlier determination that the detail of the tip in *Draper* was self-verifying. See 393 U. S., at 416–417. It is noteworthy that although the affiant in *Spinelli* had sworn that the informer was reliable, "he [had] offered the magistrate no reason in support of this conclusion." *Id.,* at 416. *Aguilar's* veracity prong, therefore, was not satisfied. 393 U. S., at 416.

reliability of an officer is sufficient reason for believing his current assertions." *Ibid.* JUSTICE WHITE went on to state:

"Nor would it suffice, I suppose, if a reliable informant states there is gambling equipment in Apartment 607 and then proceeds to describe in detail Apartment 201, a description which is verified before applying for the warrant. He was right about 201, but that hardly makes him more believable about the equipment in 607. But what if he states that there are narcotics locked in a safe in Apartment 300, which is described in detail, and the apartment manager verifies everything but the contents of the safe? I doubt that the report about the narcotics is made appreciably more believable by the verification. The informant could still have gotten his information concerning the safe from others about whom nothing is known or could have inferred the presence of narcotics from circumstances which a magistrate would find unacceptable." *Ibid.*

I find this reasoning persuasive. Properly understood, therefore, *Spinelli* stands for the proposition that corroboration of certain details in a tip may be sufficient to satisfy the veracity, but not the basis of knowledge, prong of *Aguilar*. As noted, *Spinelli* also suggests that in some limited circumstances considerable detail in an informant's tip may be adequate to satisfy the basis of knowledge prong of *Aguilar*.[5]

---

[5] After concluding that the tip was not sufficient to support a finding of probable cause, the Court stated:

"This is not to say that the tip was so insubstantial that it could not properly have counted in the magistrate's determination. Rather, it needed some further support. When we look to the other parts of the application, however, we find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed." *Spinelli* v. *United States*, 393 U. S., at 418.

The Court went on to suggest that corroboration of incriminating facts would be needed. See *ibid.*

Although the rules drawn from the cases discussed above are cast in procedural terms, they advance an important underlying substantive value: Findings of probable cause, and attendant intrusions, should not be authorized unless there is some assurance that the information on which they are based has been obtained in a reliable way by an honest or credible person. As applied to police officers, the rules focus on the way in which the information was acquired. As applied to informants, the rules focus both on the honesty or credibility of the informant and on the reliability of the way in which the information was acquired. Insofar as it is more complicated, an evaluation of affidavits based on hearsay involves a more difficult inquiry. This suggests a need to structure the inquiry in an effort to insure greater accuracy. The standards announced in *Aguilar*, as refined by *Spinelli*, fulfill that need. The standards inform the police of what information they have to provide and magistrates of what information they should demand. The standards also inform magistrates of the subsidiary findings they must make in order to arrive at an ultimate finding of probable cause. *Spinelli*, properly understood, directs the magistrate's attention to the possibility that the presence of self-verifying detail might satisfy *Aguilar*'s basis of knowledge prong and that corroboration of the details of a tip might satisfy *Aguilar*'s veracity prong. By requiring police to provide certain crucial information to magistrates and by structuring magistrates' probable-cause inquiries, *Aguilar* and *Spinelli* assure the magistrate's role as an independent arbiter of probable cause, insure greater accuracy in probable-cause determinations, and advance the substantive value identified above.

Until today the Court has never squarely addressed the application of the *Aguilar* and *Spinelli* standards to tips from anonymous informants. Both *Aguilar* and *Spinelli* dealt with tips from informants known at least to the police. See also, *e. g.*, *Adams* v. *Williams*, 407 U. S. 143, 146 (1972); *United States* v. *Harris*, 403 U. S. 573, 575 (1971); *Whiteley* v. *Warden*, 401 U. S., at 565; *McCray* v. *Illinois*, 386 U. S.

300, 302 (1967); *Jones* v. *United States*, 362 U. S., at 268–269. And surely there is even more reason to subject anonymous informants' tips to the tests established by *Aguilar* and *Spinelli*. By definition nothing is known about an anonymous informant's identity, honesty, or reliability. One commentator has suggested that anonymous informants should be treated as presumptively unreliable. See Comment, Anonymous Tips, Corroboration, and Probable Cause: Reconciling the *Spinelli/Draper* Dichotomy in *Illinois v. Gates*, 20 Am. Crim. L. Rev. 99, 107 (1982). See also *Adams* v. *Williams*, *supra*, at 146 (suggesting that an anonymous telephone tip provides a weaker case for a *Terry* v. *Ohio*, 392 U. S. 1 (1968), stop than a tip from an informant known to the police who had provided information in the past); *United States* v. *Harris*, *supra*, at 599 (Harlan, J., dissenting) ("We cannot assume that the ordinary law-abiding citizen has qualms about [appearing before a magistrate]"). In any event, there certainly is no basis for treating anonymous informants as presumptively reliable. Nor is there any basis for assuming that the information provided by an anonymous informant has been obtained in a reliable way. If we are unwilling to accept conclusory allegations from the police, who are presumptively reliable, or from informants who are known, at least to the police, there cannot possibly be any rational basis for accepting conclusory allegations from anonymous informants.

To suggest that anonymous informants' tips are subject to the tests established by *Aguilar* and *Spinelli* is not to suggest that they can never provide a basis for a finding of probable cause. It is conceivable that police corroboration of the details of the tip might establish the reliability of the informant under *Aguilar*'s veracity prong, as refined in *Spinelli*, and that the details in the tip might be sufficient to qualify under the "self-verifying detail" test established by *Spinelli* as a means of satisfying *Aguilar*'s basis of knowledge prong. The *Aguilar* and *Spinelli* tests must be applied to anonymous informants' tips, however, if we are to continue to insure

that findings of probable cause, and attendant intrusions, are based on information provided by an honest or credible person who has acquired the information in a reliable way.[6]

In light of the important purposes served by *Aguilar* and *Spinelli*, I would not reject the standards they establish. If anything, I simply would make more clear that *Spinelli*, properly understood, does not depart in any fundamental way from the test established by *Aguilar*. For reasons I shall next state, I do not find persuasive the Court's justifications for rejecting the test established by *Aguilar* and refined by *Spinelli*.

---

[6] As noted, *supra*, at 277–282, *Aguilar* and *Spinelli* inform the police of what information they have to provide and magistrates of what information they should demand. This advances the important process value, which is intimately related to substantive Fourth Amendment concerns, of having magistrates, rather than police, or informants, determine whether there is probable cause to support the issuance of a warrant. We want the police to provide magistrates with the information on which they base their conclusions so that magistrates can perform their important function. When the police rely on facts about which they have personal knowledge, requiring them to disclose those facts to magistrates imposes no significant burden on the police. When the police rely on information obtained from confidential informants, requiring the police to disclose the facts on which the informants based their conclusions imposes a more substantial burden on the police, but it is one that they can meet because they presumably have access to their confidential informants.

In cases in which the police rely on information obtained from an anonymous informant, the police, by hypothesis, cannot obtain further information from the informant regarding the facts and circumstances on which the informant based his conclusion. When the police seek a warrant based solely on an anonymous informant's tip, therefore, they are providing the magistrate with all the information on which they have based their conclusion. In this respect, the command of *Aguilar* and *Spinelli* has been met and the process value identified above has been served. But *Aguilar* and *Spinelli* advance other values which argue for their application even to anonymous informants' tips. They structure the magistrate's probable-cause inquiry and, more importantly, they guard against findings of probable cause, and attendant intrusions, based on anything other than information which magistrates reasonably can conclude has been obtained in a reliable way by an honest or credible person.

## II

In rejecting the *Aguilar-Spinelli* standards, the Court suggests that a "totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip." *Ante,* at 230–231 (footnote omitted). In support of this proposition the Court relies on several cases that purportedly reflect this approach, *ante,* at 230–231, n. 6, 232–233, n. 7, and on the "practical, nontechnical," *ante,* at 231, nature of probable cause.

Only one of the cases cited by the Court in support of its "totality of the circumstances" approach, *Jaben* v. *United States,* 381 U. S. 214 (1965), was decided subsequent to *Aguilar.* It is by no means inconsistent with *Aguilar.*[7] The other three cases[8] cited by the Court as supporting its

---

[7] In *Jaben* v. *United States,* the Court considered whether there was probable cause to support a complaint charging petitioner with willfully filing a false tax return. 381 U. S., at 221. After reviewing the extensive detail contained in the complaint, *id.,* at 223, the Court expressly distinguished tax offenses from other types of offenses:

"Some offenses are subject to putative establishment by blunt and concise factual allegations, *e. g.,* 'A saw narcotics in B's possession,' whereas 'A saw B file a false tax return' does not mean very much in a tax evasion case. Establishment of grounds for belief that the offense of tax evasion has been committed often requires a reconstruction of the taxpayer's income from many individually unrevealing facts which are not susceptible of a concise statement in a complaint. Furthermore, unlike narcotics informants, for example, whose credibility may often be suspect, the sources in this tax evasion case are much less likely to produce false or untrustworthy information. Thus, whereas some supporting information concerning the credibility of informants in narcotics cases or other common garden varieties of crime may be required, such information is not so necessary in the context of the case before us." *Id.,* at 223–224.

Obviously, *Jaben* is not inconsistent with *Aguilar* and involved no general rejection of the *Aguilar* standards.

[8] *Rugendorf* v. *United States,* 376 U. S. 528 (1964); *Ker* v. *California,* 374 U. S. 23 (1963); *Jones* v. *United States,* 362 U. S. 257 (1960).

totality-of-the-circumstances approach were decided before *Aguilar*. In any event, it is apparent from the Court's discussion of them, see *ante*, at 232–233, n. 7, that they are not inconsistent with *Aguilar*.

In addition, one can concede that probable cause is a "practical, nontechnical" concept without betraying the values that *Aguilar* and *Spinelli* reflect. As noted, see *supra*, at 277–282, *Aguilar* and *Spinelli* require the police to provide magistrates with certain crucial information. They also provide structure for magistrates' probable-cause inquiries. In so doing, *Aguilar* and *Spinelli* preserve the role of magistrates as independent arbiters of probable cause, insure greater accuracy in probable-cause determinations, and advance the substantive value of precluding findings of probable cause, and attendant intrusions, based on anything less than information from an honest or credible person who has acquired his information in a reliable way. Neither the standards nor their effects are inconsistent with a "practical, nontechnical" conception of probable cause. Once a magistrate has determined that he has information before him that he can reasonably say has been obtained in a reliable way by a credible person, he has ample room to use his common sense and to apply a practical, nontechnical conception of probable cause.

It also should be emphasized that cases such as *Nathanson* v. *United States*, 290 U. S. 41 (1933), and *Giordenello* v. *United States*, 357 U. S. 480 (1958), discussed *supra*, at 276–277, directly contradict the Court's suggestion, *ante*, at 233, that a strong showing on one prong of the *Aguilar* test should compensate for a deficient showing on the other. If the conclusory allegations of a presumptively reliable police officer are insufficient to establish probable cause, there is no conceivable reason why the conclusory allegations of an anonymous informant should not be insufficient as well. Moreover, contrary to the Court's implicit suggestion, *Aguilar* and *Spinelli* do not stand as an insuperable barrier to the use

of even anonymous informants' tips to establish probable cause. See *supra*, at 277–282. It is no justification for rejecting them outright that some courts may have employed an overly technical version of the *Aguilar-Spinelli* standards, see *ante*, at 234–235, and n. 9.

The Court also insists that the *Aguilar-Spinelli* standards must be abandoned because they are inconsistent with the fact that nonlawyers frequently serve as magistrates. *Ante*, at 235–236. To the contrary, the standards help to structure probable-cause inquiries and, properly interpreted, may actually help a nonlawyer magistrate in making a probable-cause determination. Moreover, the *Aguilar* and *Spinelli* tests are not inconsistent with deference to magistrates' determinations of probable cause. *Aguilar* expressly acknowledged that reviewing courts "will pay substantial deference to judicial determinations of probable cause . . . ." 378 U. S., at 111. In *Spinelli,* the Court noted that it was not retreating from the proposition that magistrates' determinations of probable cause "should be paid great deference by reviewing courts . . . ." 393 U. S., at 419. It is also noteworthy that the language from *United States* v. *Ventresca,* 380 U. S., at 108–109, which the Court repeatedly quotes, see *ante*, at 235, 236, and 237, n. 10, brackets the following passage, which the Court does not quote:

"This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. See *Aguilar* v. *Texas, supra.* Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not

invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." 380 U. S., at 108–109.[9]

At the heart of the Court's decision to abandon *Aguilar* and *Spinelli* appears to be its belief that "the direction taken by decisions following *Spinelli* poorly serves '[t]he most basic function of any government': 'to provide for the security of the individual and of his property.'" *Ante*, at 237. This conclusion rests on the judgment that *Aguilar* and *Spinelli* "seriously imped[e] the task of law enforcement," *ante*, at 237, and render anonymous tips valueless in police work. *Ibid.* Surely, the Court overstates its case. See *supra*, at 287–288. But of particular concern to all Americans must be that the Court gives virtually no consideration to the value of insuring that findings of probable cause are based on information that a magistrate can reasonably say has been obtained in a reli-

---

[9] The Court also argues that "[i]f the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search." *Ante*, at 236. If the Court is suggesting, as it appears to be, that the police will intentionally disregard the law, it need only be noted in response that the courts are not helpless to deal with such conduct. Moreover, as was noted in *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971):

"[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.'" *Id.*, at 454–455 (plurality opinion) (footnotes omitted).

It therefore would appear to be not only inadvisable, but also unavailing, for the police to conduct warrantless searches in "the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search." *Ante*, at 236.

290

able way by an honest or credible person. I share JUSTICE WHITE's fear that the Court's rejection of *Aguilar* and *Spinelli* and its adoption of a new totality-of-the-circumstances test, *ante*, at 238, "may foretell an evisceration of the probable-cause standard . . . ." *Ante*, at 272 (WHITE, J., concurring in judgment).

### III

The Court's complete failure to provide any persuasive reason for rejecting *Aguilar* and *Spinelli* doubtlessly reflects impatience with what it perceives to be "overly technical" rules governing searches and seizures under the Fourth Amendment. Words such as "practical," "nontechnical," and "common sense," as used in the Court's opinion, are but code words for an overly permissive attitude towards police practices in derogation of the rights secured by the Fourth Amendment. Everyone shares the Court's concern over the horrors of drug trafficking, but under our Constitution only measures consistent with the Fourth Amendment may be employed by government to cure this evil. We must be ever mindful of Justice Stewart's admonition in *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971): "In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts." *Id.*, at 455 (plurality opinion). In the same vein, *Glasser* v. *United States*, 315 U. S. 60 (1942), warned that "[s]teps innocently taken may, one by one, lead to the irretrievable impairment of substantial liberties." *Id.*, at 86.

Rights secured by the Fourth Amendment are particularly difficult to protect because their "advocates are usually criminals." *Draper* v. *United States*, 358 U. S., at 314 (Douglas, J., dissenting). But the rules "we fashion [are] for the innocent and guilty alike." *Ibid.* See also *Kolender* v. *Lawson*, 461 U. S. 352, 362, n. 1 (1983) (BRENNAN, J., concurring); *Brinegar* v. *United States*, 338 U. S., at 181 (Jackson, J., dis-

senting). By replacing *Aguilar* and *Spinelli* with a test that provides no assurance that magistrates, rather than the police, or informants, will make determinations of probable cause; imposes no structure on magistrates' probable-cause inquiries; and invites the possibility that intrusions may be justified on less than reliable information from an honest or credible person, today's decision threatens to "obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Johnson* v. *United States*, 333 U. S., at 17.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, dissenting.

The fact that Lance and Sue Gates made a 22-hour non-stop drive from West Palm Beach, Florida, to Bloomingdale, Illinois, only a few hours after Lance had flown to Florida provided persuasive evidence that they were engaged in illicit activity. That fact, however, was not known to the judge when he issued the warrant to search their home.

What the judge did know at that time was that the anonymous informant had not been completely accurate in his or her predictions. The informant had indicated that "'Sue . . . drives their car to Florida *where she leaves it to be loaded up with drugs . . . . Sue fl[ies] back after she drops the car off in Florida.'"* 85 Ill. 2d 376, 379, 423 N. E. 2d 887, 888 (1981) (emphasis added). Yet Detective Mader's affidavit reported that she "'left the West Palm Beach area driving the Mercury northbound.'" 82 Ill. App. 3d 749, 757, 403 N. E. 2d 77, 82 (1980).

The discrepancy between the informant's predictions and the facts known to Detective Mader is significant for three reasons. First, it cast doubt on the informant's hypothesis that the Gates already had "'over [$100,000] worth of drugs in their basement,'" 85 Ill. 2d, at 379, 423 N. E. 2d, at 888. The informant had predicted an itinerary that always kept one

spouse in Bloomingdale, suggesting that the Gates did not want to leave their home unguarded because something valuable was hidden within. That inference obviously could not be drawn when it was known that the pair was actually together over a thousand miles from home.

Second, the discrepancy made the Gates' conduct seem substantially less unusual than the informant had predicted it would be. It would have been odd if, as predicted, Sue had driven down to Florida on Wednesday, left the car, and flown right back to Illinois. But the mere facts that Sue was in West Palm Beach with the car,[1] that she was joined by her husband at the Holiday Inn on Friday,[2] and that the couple drove north together the next morning[3] are neither unusual nor probative of criminal activity.

---

[1] The anonymous note suggested that she was going down on Wednesday, 85 Ill. 2d, at 379, 423 N. E. 2d, at 888, but for all the officers knew she had been in Florida for a month. 82 Ill. App. 3d, at 755–757, 403 N. E. 2d, at 82–83.

[2] Lance does not appear to have behaved suspiciously in flying down to Florida. He made a reservation in his own name and gave an accurate home phone number to the airlines. Cf. *Florida* v. *Royer*, 460 U. S. 491, 493, n. 2 (1983); *United States* v. *Mendenhall*, 446 U. S. 544, 548 (1980) (Stewart, J., announcing the judgment). And Detective Mader's affidavit does not report that he did any of the other things drug couriers are notorious for doing, such as paying for the ticket in cash, *Royer*, 460 U. S., at 493, n. 2, dressing casually, *ibid.*, looking pale and nervous, *ibid.; Mendenhall, supra*, at 548, improperly filling out baggage tags, *Royer*, 460 U. S., at 493, n. 2, carrying American Tourister luggage, *ibid.*, not carrying any luggage, *Mendenhall*, 446 U. S., at 564–565 (POWELL, J., concurring in part and concurring in judgment), or changing airlines en route, *ibid.*

[3] Detective Mader's affidavit hinted darkly that the couple had set out upon "that interstate highway commonly used by travelers to the Chicago area." But the same highway is also commonly used by travelers to Disney World, Sea World, and Ringling Brothers and Barnum and Bailey Circus World. It is also the road to Cocoa Beach, Cape Canaveral, and Washington, D. C. I would venture that each year dozens of perfectly innocent people fly to Florida, meet a waiting spouse, and drive off together in the family car.

Third, the fact that the anonymous letter contained a material mistake undermines the reasonableness of relying on it as a basis for making a forcible entry into a private home.[4]

Of course, the activities in this case did not stop when the judge issued the warrant. The Gates drove all night to Bloomingdale, the officers searched the car and found 400 pounds of marihuana, and then they searched the house.[5] However, none of these subsequent events may be considered in evaluating the warrant,[6] and the search of the house was legal only if the warrant was valid. *Vale* v. *Louisiana*, 399 U. S. 30, 33–35 (1970). I cannot accept the Court's casual conclusion that, *before the Gates arrived in Bloomingdale*, there was probable cause to justify a valid entry and search of a private home. No one knows who the informant in this case was, or what motivated him or her to write the note. Given that the note's predictions were faulty in one

---

[4] The Court purports to rely on the proposition that "if the [anonymous] informant could predict with *considerable accuracy* the *somewhat unusual travel plans* of the Gateses, he probably also had a reliable basis for his statements that the Gateses kept a large quantity of drugs in their home." *Ante*, at 245–246, n. 14 (emphasis added). Even if this syllogism were sound, but see *Spinelli* v. *United States*, 393 U. S. 410, 427 (1969) (WHITE, J., concurring), its premises are not met in this case.

[5] The officers did not enter the unoccupied house as soon as the warrant issued; instead, they waited until the Gates returned. It is unclear whether they waited because they wanted to execute the warrant without unnecessary property damage or because they had doubts about whether the informant's tip was really valid. In either event their judgment is to be commended.

[6] It is a truism that "a search warrant is valid only if probable cause has been shown to the magistrate and that an inadequate showing may not be rescued by post-search testimony on information known to the searching officers at the time of the search." *Rice* v. *Wolff*, 513 F. 2d 1280, 1287 (CA8 1975). See *Coolidge* v. *New Hampshire*, 403 U. S. 443, 450–451 (1971); *Whiteley* v. *Warden*, 401 U. S. 560, 565, n. 8 (1971); *Aguilar* v. *Texas*, 378 U. S. 108, 109, n. 1 (1964); *Jones* v. *United States*, 357 U. S. 493, 497–498 (1958); *Giordenello* v. *United States*, 357 U. S. 480, 486 (1958); *Taylor* v. *United States*, 286 U. S. 1, 6 (1932); *Agnello* v. *United States*, 269 U. S. 20, 33 (1925).

significant respect, and were corroborated by nothing except
ordinary innocent activity, I must surmise that the Court's
evaluation of the warrant's validity has been colored by sub-
sequent events.[7]

Although the foregoing analysis is determinative as to
the house search, the car search raises additional issues be-
cause "there is a constitutional difference between houses
and cars." *Chambers* v. *Maroney*, 399 U. S. 42, 52 (1970).
Cf. *Payton* v. *New York*, 445 U. S. 573, 589–590 (1980). An
officer who has probable cause to suspect that a highly mov-
able automobile contains contraband does not need a valid
warrant in order to search it. This point was developed in
our opinion in *United States* v. *Ross*, 456 U. S. 798 (1982),
which was not decided until after the Illinois Supreme Court
rendered its decision in this case. Under *Ross*, the car
search may have been valid if the officers had probable cause
*after* the Gates arrived.

In apologizing for its belated realization that we should not
have ordered reargument in this case, the Court today shows
high regard for the appropriate relationship of this Court to
state courts. *Ante*, at 221–222. When the Court discusses
the merits, however, it attaches no weight to the conclusions
of the Circuit Judge of Du Page County, Illinois, of the three
judges of the Second District of the Illinois Appellate Court,
or of the five justices of the Illinois Supreme Court, all of
whom concluded that the warrant was not based on probable
cause. In a fact-bound inquiry of this sort, the judgment of
three levels of state courts, all of which are better able to
evaluate the probable reliability of anonymous informants in

---

[7] *Draper* v. *United States*, 358 U. S. 307 (1959), affords no support for
today's holding. That case did not involve an anonymous informant. On
the contrary, as the Court twice noted, Mr. Hereford was "employed for
that purpose and [his] information had always been found accurate and reli-
able." *Id.*, at 313; see *id.*, at 309. In this case, the police had no prior
experience with the informant, and some of his or her information in this
case was unreliable and inaccurate.

Bloomingdale, Illinois, than we are, should be entitled to at least a presumption of accuracy.[8] I would simply vacate the judgment of the Illinois Supreme Court and remand the case for reconsideration in the light of our intervening decision in *United States* v. *Ross*.

---

[8] The Court holds that what were heretofore considered two independent "prongs"—"veracity" and "basis of knowledge"—are now to be considered together as circumstances whose totality must be appraised. *Ante,* at 233. "[A] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Ibid.* Yet in this case, the lower courts found *neither* factor present. 85 Ill. 2d, at 390, 423 N. E. 2d, at 893. And the supposed "other indicia" in the affidavit take the form of activity that is not particularly remarkable. I do not understand how the Court can find that the "totality" so far exceeds the sum of its "circumstances."